Filed 4/10/17 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEXANDER CERVANTES,<br><br>    Defendant and Appellant. | A140464<br><br>(Solano County<br>Super. Ct. No. FCR281334)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 9, 2017, be modified as follows:

1. On page 2, in the last sentence of the first paragraph, add "counts" to the phrase: "affirming as to the remaining seven, including the convictions for burglary," so that the sentence reads:

   We therefore reverse on eight specific intent counts, while affirming as to the remaining seven counts, including the convictions for burglary and all of the general intent crimes (four of the six sex offenses, and two counts of assault with a deadly weapon).

2. On page 9, in the first full paragraph, in the sentence that begins, "Another recent criminal case in town also involved," change the placement of the word "also" so that the sentence reads:

   Another recent criminal case in town involved a defendant named Richard Calkins, who also took psilocybin mushrooms and then shot and killed two of his best friends and maimed a third while they were watching television, with no preceding argument or other provocation.

3. On page 43, in the first sentence beginning, "Having concluded," delete the words, "in the unpublished portion of our opinion," so that the sentence reads:

> Having concluded that we must reverse eight counts of conviction that required specific intent and will affirm seven counts, including the burglary conviction, we now turn to the impact on our disposition of Prop 57, which was passed by the voters on November 8, 2016.

4. On page 46, delete the last sentence in the partial paragraph at the top of the page: "Mandatory direct filing had first been instituted by the Legislature for juveniles age 16 or older effective January 1, 2000 (Stats. 1999, ch. 996, § 12.2, p. 7560), but Prop 21 reduced the age to 14."

5. On page 53, in the last full sentence on the page, which begins "Thus, the phrase," add "upon the filing of a transfer motion" to the end of the phrase set off by dashes, so that the full sentence reads:

> Thus, the phrase, "tried in adult court"—or the prospect of being tried in adult court upon the filing of a transfer motion—appears to be the trigger for a juvenile's right to a fitness hearing.

6. On page 57, add the word "considered" to the end of the first sentence of the last paragraph, which begins "By excising," so the sentence reads:

> By excising subdivision (b) of Section 602, the voters determined that every juvenile facing trial in criminal court should first have his or her fitness for treatment under the juvenile court law considered.

7. On page 61, break the sentence that begins "By our understanding of jeopardy principles," into two sentences by putting a period after "subdivision (a)(1)," changing the word "since" to "And," and capitalizing the first letter of the word "section" in the second sentence. The new text shall read:

> By our understanding of jeopardy principles, if we instruct the trial court to transfer the case to juvenile court for a fitness hearing before commencing any retrial, the district attorney will have an opportunity to request a transfer to adult court "prior to the attachment of jeopardy" within the meaning of Section 707, subdivision (a)(1). And by obtaining the benefit of Section 707 in that circumstance, the defendant implicitly waives any right to object to a transfer motion.

2

8. On page 65, in the second sentence of the second paragraph beginning, "Thus, a juvenile disposition must realistically be considered," change "Thus" to "As a result," so that the sentence will read:

> As a result, a juvenile disposition must realistically be considered a more advantageous disposition than a criminal sentence for the same offense.

9. On page 66, in the last sentence of the page that starts with "We note that," add "when he is resentenced and" to the middle of the sentence so it reads:

> We note that, even if Cervantes is ultimately transferred back to criminal court, the fitness hearing will also serve the purpose of making a record of any mitigating factors that may apply when he is resentenced and eventually comes up for parole.

10. On page 70, in the first sentence of the first full paragraph, beginning "But it was not," add "nonhomicide" after the word "juvenile," so the sentence reads:

> But it was not ultimately the severity of the eventual punishment that inspired the Supreme Court to declare LWOP sentences unconstitutional for juvenile nonhomicide offenders; it was the lack of opportunity for parole release.

11. On page 76, in the sentence starting with "Assuming a 50-year to life sentence, add "it" to the phrase, "without offending the Constitution, would be error of constitutional dimension," so the new sentence reads:

> Assuming a 50-year to life sentence ultimately passes constitutional muster, and although the parole authorities or the juvenile court may decide to keep Cervantes in prison for the remainder of his life without offending the Constitution, it would be error of constitutional dimension under *Graham* and *Caballero* for a sentencing judge to write him off as irredeemable at the time of initial sentencing.

There is no change in the judgment.

Dated: _____            _____, P.J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALEXANDER CERVANTES,<br><br>     Defendant and Appellant. | A140464<br><br>(Solano County<br>Super. Ct. No. FCR281334) |

     Alexander Cervantes was 14 years old when he attacked a 13-year-old girl and her 20-month-old brother, who were the younger siblings of one of his friends. After breaking into their home in the middle of the night, he stabbed them repeatedly as they slept, raped and sodomized the girl, forced her to orally copulate him, and ultimately passed out during the attack. He had been drinking heavily that evening and his defense rested on voluntary intoxication to negate specific intent. He was convicted of 15 charges, including various sex offenses, first-degree burglary, and two counts each of attempted murder, torture, and aggravated mayhem. He received a prison sentence of 50 years to life under the one-strike law (Pen. Code,[1] § 667.61), a consecutive 11-year determinate term for one attempted murder (§§ 187, 664), plus a consecutive life term for the other attempted murder.

     We divide our discussion into three parts. Only an overview of the first part shall be published, but the remaining two parts are certified for publication in their entirety

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.2 through II.A.7.e.

[1] Statutory references, unless otherwise indicated, are to the Penal Code.

First, Cervantes argues that the representation he received was so far below the minimum threshold of constitutionally effective assistance of counsel as to amount to no defense at all. Pointing to dozens of shortcomings—beginning with an incomplete investigation of his mental state, which he says guaranteed his counsel either had no basis for strategic choices she made or simply failed to recognize choices she should have made—he asks that we reverse outright, and remand for a new trial. While we reject that argument, we agree there were a number of serious deficiencies in counsel's performance, enough to leave us without confidence in the outcome of the trial on most of the specific intent crimes. We therefore reverse on eight specific intent counts, while affirming as to the remaining seven, including the convictions for burglary and all of the general intent crimes (four of the six sex offenses, and two counts of assault with a deadly weapon).

Second, our conclusion that we must reverse and remand for retrial on eight of 15 counts presents some novel issues under recently-passed Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Prop 57). Cervantes argues Prop 57 requires that the case be remanded for a "fitness hearing" to the juvenile court, which he contends has "exclusive jurisdiction" over any trial of the offenses charged in this case until and unless it determines that the case should be transferred to adult criminal court, and further, that a remand for retrial on any of the counts of which he was convicted requires vacatur of all the convictions and retrial of all charges. He argues that Prop 57 is retroactive, but that this result is mandated even applying Prop 57 prospectively to any proceedings on remand after a partial reversal. We do not agree that Prop 57 is retroactive. Nor do we agree that a partial reversal requires that all convictions must be vacated. But we do agree that Prop 57 requires a remand to the juvenile court for a "fitness hearing," and that the outcome of that hearing will determine which department of the Superior Court— adult criminal court, or juvenile court—will handle any retrial on the reversed counts and sentencing.

Third, Cervantes argues that the sentence imposed on him is the functional equivalent of life without possibility of parole and therefore violates the Eighth

2

Amendment under *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*). Since the sentencing choices made on the convictions we affirm, even without conviction on the counts we reverse, could produce another indeterminate life sentence with a lengthy minimum term, this Eighth Amendment issue will be relevant to the proceedings on remand whether Cervantes's case is handled in adult criminal court or stays in juvenile court. Thus, we address it and conclude that a sentence requiring Cervantes to serve at least 66 years in prison before he would first become eligible for parole, is constitutionally infirm. Because that term exceeds his life expectancy, it is the functional equivalent of life without parole and violates the Eighth Amendment under *Graham*, at p. 74 and *Caballero,* at p. 268. Where, exactly, the constitutional line lies below the 66 years to life imposed in this case has yet to be addressed by our Supreme Court, although we note that some guidance on the issue will likely be forthcoming in a case now pending before it. In the meantime, the Prop 57 "fitness hearing" we order today will rectify any constitutional concerns about the length of whatever term of confinement is imposed on Cervantes for the convictions we affirm here, as well as for any other offenses that may be tried on remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts Disclosed at Trial

#### 1. *Prosecution's Case*

On the evening of December 11, 2010, Cervantes attended a party, where witnesses saw him drinking from 6:00 p.m. to 9:00 p.m. One of the partygoers described him as "really drunk" at 10:20 p.m.

At approximately 1:30 or 2:00 a.m. on December 12, 2010, Cervantes entered the Vacaville home of his sometime friend, Gabriel T. (Gabriel).[2] He carried a steak knife he

---

[2] The true nature of the relationship between Cervantes and Gabriel was ambiguous. There was evidence that they had a "very strong relationship," Cervantes "worship[ped]" Gabriel, and Gabriel taught Cervantes about taking drugs. But Cervantes, who was younger, was also described as "sort of the lackey," and Gabriel told

3

had brought from home and had a condom with him.  Gabriel was not at home because he was in juvenile hall.  The only occupants were Gabriel's younger sister, 13-year-old A.P., and their 20-month-old brother, I.A.  A.P. was babysitting I.A. while their mother and another sister were out of the house.

As the evening progressed, A.P. and I.A. fell asleep on their mother's bed.  A.P. awoke to the sensation of a sharp pain in her back like someone was punching her, and she saw blood underneath her on the bed.  Looking in the mirror, she saw someone else in the room.  Turning, she recognized Cervantes as a friend of her older brother's.  A.P. testified he was wearing black gloves and a black jacket.[3]  She asked Cervantes why he was there.  "He said that it was revenge for my brother, against Richard—something with an R," or "revenge for [her] brother for snitching on . . . Richard . . . ."  A.P. did not know what he was talking about.  As A.P. tried to unlock her cell phone to call 911, she fell off the bed.  While she was on the floor, Cervantes stabbed her repeatedly in her head, back, and shoulders.  A.P. suffered defensive wounds on her wrists and elbow when she tried to shield her head.  She begged Cervantes to stop and eventually he did.  After Cervantes stopped stabbing her, A.P. heard her baby brother "squeal," but she could not move to help him.  Then the screaming stopped.

Cervantes came back over to A.P. and "started getting into [her] pants."  He put his hand down the back of her pants and "was feeling on [her] butt."  Cervantes told A.P. to get on the bed and she complied out of fear.  Cervantes got on top of her and put his penis in her vagina.  After a couple of minutes, he told A.P. to moan and call him "daddy."  When A.P. did not comply, Cervantes threatened to kill her brother, by which A.P. thought he meant Gabriel.  A.P. complied with Cervantes's demands.  Cervantes

the police he did not like Cervantes very much and called him "hella stupid," "retarded," and a "pussy."

[3] Defense counsel elicited testimony on cross-examination of a police witness that Cervantes was not wearing gloves at the time of his arrest, and that the officer did not know of any gloves found on the premises.  An investigating detective did not recall A.P. saying the suspect wore gloves when she spoke to police near the time of the crime.  The implication was that A.P. may have embellished her story and was not trustworthy.

"finally stopped" and told her to "turn around." A.P. rolled onto her stomach, and Cervantes sodomized her. Cervantes "finally stopped," then told A.P. she "was going to suck his dick." Cervantes "kind of put his penis up into [her] mouth" and "pulled [her] head down." When A.P. saw Cervantes starting to doze off, she tried to get away, but he grabbed her hair and "yanked [her] back down." Eventually, Cervantes fell asleep.

A.P. grabbed her phone and her little brother and quickly got out of the room. Entering the kitchen, she noticed the door to the garage was standing open, as was the door leading from the garage to the outside of the house. Both doors had been closed earlier and the external door was normally kept locked. Once outside, A.P. called 911 and went across the street to a neighbor's house.

Shortly after 4:00 a.m. a SWAT team responded to A.P.'s home, eventually entered, and arrested Cervantes in the master bedroom. He was naked and smeared with blood. A large bloodstain and what appeared to be urine were found on the sheets.

When the crime scene was processed three empty beer cans were found: one was on the couch, one by the sink in the kitchen, and the third on the driveway in front of the garage. Cervantes's DNA was found on two of the beer cans. The parties stipulated that both victims' blood was found on a knife retrieved from the bedroom where the children were attacked, and the investigation showed the knife matched another steak knife found at Cervantes's mother's house. The parties also stipulated that (1) DNA testing could not exclude Cervantes as the source of semen found on anal swabs taken from A.P., and (2) A.P.'s dried blood was found on Cervantes at the time of his arrest.

After the attack, the children were taken to the hospital. A.P. had been stabbed a total of 42 times, and I.A. had been stabbed 13 times. A.P. had a collapsed lung and a lacerated liver and spleen. I.A. had four fractured ribs and internal injuries. A.P. was hospitalized for three days, and both children were scarred by the knife wounds they suffered that night.

### 2. *The Charges, the Defense Case, and the Verdicts*

Cervantes was charged as an adult by information filed on March 29, 2011. (Welf. & Inst. Code, former §§ 602, subd. (b)(2), 707, subd. (d)(2)(A).) An amended

5

information filed on September 17, 2012 charged Cervantes with two counts of attempted willful, deliberate, and premeditated murder (§§ 664, 187) (counts 1, 2), first degree burglary (§ 459) (count 3), two counts of torture (§ 206) (counts 4, 5), two counts of aggravated mayhem (§ 205) (counts 6, 7), two counts of assault with a deadly weapon (§ 245, subd. (a)(1)) (counts 8, 9), assault with intent to commit rape, sodomy, or oral copulation on a person under 18 years (§ 220, subd. (a)(2)) (count 10), forcible rape of a child under 14 years (§§ 261, subd. (a)(2), 264, subd. (c)(1)) (count 11), forcible sodomy of a child under 14 years (§ 286, subd. (c)(2)(B)) (count 12), two counts of forcible oral copulation of a child under 14 years (§ 288a, subd. (c)(2)(B)) (counts 13, 14), and forcible lewd act on a child (§ 288, subd. (b)(1)) (count 15). The information further alleged as to counts 1 through 7 and 10 through 15 that Cervantes personally used a deadly and dangerous weapon, a knife (former § 12022, subd. (b)(1)); as to counts 1 through 3 and 6 through 15 that Cervantes personally inflicted great bodily injury (former § 12022.7, subd. (a)); and as to counts 10 through 15 that Cervantes inflicted great bodily injury (§ 12022.8). The information included allegations as to counts 11 through 15 under section 667.61, known as the "one-strike" law, which calls for life sentences, including mandatory minimums, for individuals convicted of certain sex offenses in particularly blameworthy circumstances. The one-strike allegations against Cervantes included that the sex crimes were committed during a first-degree burglary (§ 667.61, subds. (d)(4), (e)(2)), that Cervantes also committed aggravated mayhem against and tortured A.P. (§ 667.61, subd. (d)(3)), personally inflicted great bodily injury on her (§ 667.61, subd. (d)(6)), personally used a dangerous or deadly weapon (§ 667.61, subd. (e)(3)), and committed the crimes against a child under age 14 (§ 667.61, subds. (d)(7), (j)(1), (j)(2)).

Trial was held in mid-September 2012. Building on the testimony that Cervantes had been drinking during the evening before the attacks, defense counsel's strategy was to defend against all of the crimes requiring specific intent based on voluntary intoxication. The parties stipulated that Cervantes's blood alcohol level at 8:57 a.m. on December 12, 2010 was 0.12 percent. A forensic toxicologist, Jeffery Zehnder, testified

6

for the defense that Cervantes's blood alcohol level could have been as high as .25 percent at the time of the crimes. Zehnder testified about increasing levels of impairment that occur with increasing levels of blood alcohol. At .12 percent, "ability to do certain things, like speak" would be impaired, and at .15 percent there would be not only "slurred speech," but also "impaired information processing in the brain." Zehnder also testified that alcohol reduces inhibitions and can cause an individual to behave and speak recklessly and inappropriately, and a .20 percent blood alcohol level could cause severe impairment, memory loss, and black-outs.

Defense counsel argued to the jury that Cervantes was so intoxicated that he never formed the specific intent to kill and never premeditated or deliberated, and thus could not be convicted of attempted murder. She also argued, due to his inebriated state, Cervantes had not formed the intent required for burglary, torture or the other specific intent crimes.

On September 21, 2012, the jury found Cervantes guilty of all the substantive offenses, many of the enhancements, and found true some but not all of the one-strike allegations.[4] With respect to all the sex crimes, it found he personally used a deadly

---

[4] As to count 1 (attempted murder of A.P.) the jury found there was premeditation and deliberation, but as to count 2 (attempted murder of I.A.) it did not find premeditation or deliberation (attempted second-degree murder). (§§ 187, 664.) As to both attempted murders it found personal use of a deadly weapon and personal infliction of great bodily injury. (§§ 12022, subd. (b)(1), 12022.7.) It also found Cervantes guilty of the following crimes and enhancements: first-degree burglary with use of a deadly weapon and personal infliction of great bodily injury on both children as well as burglary in the commission of the sex crimes. (§§ 459, 460, 667.61, subds. (d)(4), (e)(2), 12022, subd. (b)(1)); torture of both children and aggravated mayhem with respect to both, with great bodily injury and personal deadly weapon use on those four counts (§§ 205, 206, 12022, subd. (b)(1), 12022.7); personal infliction of great bodily injury in the commission of two counts of assault with a deadly weapon (§ 245, subd. (a)(1); 12022.7); assault with

7

weapon and committed the five alleged as one-strike offenses against a child under 14 in the course of a first-degree burglary (§ 667.61, subds. (d)(4), (e)(2), (e)(3), (j)(1), (j)(2)), but found the infliction of great bodily injury, torture and aggravated mayhem one-strike allegations not true.[5] (§ 667.61, subds. (d)(3), (d)(6), (e)(3).) The true findings on the one-strike allegations subjected Cervantes to a sentence of 25 years to life on each of the five one-strike sex offenses. (§ 667.61, subds. (a), (e)(2), (e)(3), (j)(1), (j)(2).) The jury deliberated for approximately seven hours before reaching its verdicts.

On November 16, 2012, Cervantes's trial counsel filed a three-page motion for new trial, arguing the evidence was insufficient to prove he had the required specific intent to support the convictions on counts 1 through 4, 6, 7, 10 and 15. Counsel also filed a thick stack of letters from family, friends, mentors, and community members in support of Cervantes, to be used at sentencing.

### B.     Facts and Theories Developed by Pro Bono Counsel after Trial

After Cervantes was convicted, Peter Obstler, a partner in the San Francisco office of Bingham McCutchen (and later of Arnold & Porter), took an interest in the case and attended the hearing on the new trial motion. With Obstler in the lead, Bingham McCutchen substituted in as Cervantes's counsel on a pro bono basis, and Obstler and Arnold & Porter continue to represent him on appeal. A new date was set for the hearing of the motion for a new trial.

---

intent to commit rape, forcible rape on a person under age 14, sodomy by force on a person under age 14, two counts of forcible oral copulation on a person under age 14, and forcible lewd act on a child (§§ 220, subd. (a)(2), 261, subd. (a), 264, subd. (c)(1), 286, subd. (c)(2)(B), 288, subd. (b)(1), 288a, subd. (c)(2)(B)).

[5] The jury's findings were not sufficient to support a one-strike sentence under section 667.61, subdivision (d)(4), which requires not only that the sex crimes occurred during a first degree burglary, but that the burglary was committed "with intent to commit" one of the sex crimes specified in subdivision (c). (§ 667.61, subd. (d)(4).) The jury's findings do not include the intent element. But the findings do support a 25-to-life sentence on each of the qualifying sex offenses based on burglary coupled with personal use of a deadly weapon, and because the victim was under age 14. (§ 667.61, subds. (a), (e)(2), (e)(3), (j)(1), (j)(2).)

8

As he came up to speed on the case, Obstler learned that three different attorneys from the Conflict Defender's Office had represented Cervantes following his arrest. First was William Pendergast, who represented Cervantes from December 2010 to March 2011, when he was appointed as a commissioner. Then Kathryn Barton took over Cervantes's defense until she resigned from the Conflict Defender's Office around the end of 2011 or January of 2012. Beginning in February 2012, Erin Kirkpatrick, who was new to the Conflict Defender's Office, took over the representation and continued in that role through trial. Kirkpatrick had more than ten years of experience as a criminal defense attorney and entered the Conflict Defender's employ at a high level of experience and responsibility.

After reviewing the transcripts and conducting his own investigation, aided by experts, Obstler came to advocate a different theory of the crime than Kirkpatrick had pursued at trial. He noted and built upon the fact that, early in the defense investigation of the case, Cervantes reported to Pendergast that, in addition to drinking, he had also smoked marijuana[6] and taken psilocybin mushrooms on the night of the crimes, which he had purchased from a "Northsider" at the party he had attended before the attacks. Cervantes specifically told Pendergast he did not get the mushrooms from Gabriel. Cervantes told Pendergast he had taken Ecstasy (MDMA), which he purchased from Gabriel, on numerous occasions but had not used MDMA on the night of the attacks. Another recent criminal case in town also involved a defendant named Richard Calkins, who took psilocybin mushrooms and then shot and killed two of his best friends and maimed a third while they were watching television, with no preceding argument or other provocation. Calkins's crime and the role of psilocybin mushrooms in it had been reported in the local newspapers.

Even though Cervantes and Calkins apparently did not know each other, Obstler embraced the theory that the "Richard" mentioned by A.P. in her testimony was this very

---

[6] A test of Cervantes's blood or urine was positive for THC (the active ingredient in marijuana). This was not brought out at trial.

9

same Richard Calkins. He argued at the new trial motion and again on appeal that Cervantes never made the remark about "Richard," and A.P. probably misunderstood him or made it up from publicity about the *Calkins* case because her family had become suspicious that they were the targets of someone seeking revenge against Gabriel for having provided the mushrooms that resulted in such violent consequences.

Despite their lack of an actual acquaintance with one another, Obstler claims there was a connection between Cervantes and Calkins. It turned out that Gabriel had sold the psilocybin mushrooms to Calkins more than three weeks before Cervantes's crimes, and Gabriel admitted as much to the police shortly after Calkins was arrested. That is apparently why he was in juvenile hall. Based on the reactions by Calkins and Cervantes after eating the mushrooms, Dr. Alex Stalcup, a defense addiction expert, speculated that the mushrooms in both cases may have been adulterated with MDMA or "angel dust" (PCP); the expert admitted on cross-examination that he did not, in fact, know whether the mushrooms were tainted. According to expert testimony in the *Calkins* case, some of the mushrooms in his possession did test positive for MDMA. From these leads, Obstler and his team have developed the theory that Gabriel also sold psilocybin mushrooms to Cervantes at around the same time he sold them to Calkins and they, too, were tainted with MDMA.[7]

Obstler also pointed to additional information about Cervantes's developmental and mental health history that could have been used at trial to help explain his behavior

---

[7] Among the expert advice Obstler received was legal advice on competency of counsel in criminal defense from John Coffer, an attorney with 34 years of experience in both the prosecution and defense of criminal cases. Coffer prepared a lengthy written report that was admitted into evidence at the hearing on the new trial motion. The report is not signed under oath and is replete with hearsay, speculation and opinions well beyond his expertise. For instance, at the time he filed his report, Coffer's theory was that the mushrooms had been adulterated with PCP based on speculation by Dr. Alex Stalcup, an addiction expert hired by Obstler after trial. Despite this earlier theory, Obstler has now focused his suspicion on MDMA because of the similarities with the *Calkins* case.

that night. Cervantes's umbilical cord was wrapped around his neck at birth, resulting in oxygen deprivation. He was required to use oxygen machines to maintain breathing at times in his childhood. He had learning difficulties in school and had an individualized education program (IEP). He was in a car accident as a child and suffered some head injuries, at once characterized as "minor," but having led to "moderately severe brain damage." He was diagnosed with attention deficit hyperactivity disorder (ADHD) in elementary school and had been on medication for it since second grade.

But the evidence of Cervantes's developmental and mental health history was not all helpful. In one IEP, it was noted that Cervantes had an atypical obsession with sex and violence, so much so that the evaluator wondered if he had been sexually abused. When he was in the fifth or sixth grade he was removed from school and taken to the hospital after he said he was going to "kill [his] mother and burn [down the] house."

To help interpret the mental health evidence, Obstler sought out an expert, Dr. Michael Shore, a neuropsychologist, who conducted a battery of neurological tests and examinations, which led him to conclude that Cervantes had a baseline mental status of a ten-year-old. Among the tests he ordered performed was a single photon emission computed tomography (SPECT) study, which is a nuclear imaging test that employs glucose injected with radioactive material to measure brain activity. The SPECT test itself was performed by Dr. Daniel Amen, and his report was attached as an exhibit to the motion for a new trial. Dr. Amen concluded: "The most significant finding is decreased activity in the orbitofrontal cortex . . . consistent with an ADHD like process." He also found scalloping, "often indicative of some form of toxic exposure," and decreased activity in the prefrontal pole, which "may indicate a history of brain injury."

Based in part on Dr. Amen's report, Dr. Shore concluded that Cervantes's brain was "diffusely damaged" and found specific "compromise" of the prefrontal cortex. He opined that Cervantes was in a state of "acute organic psychosis" when he attacked the children. Cervantes was also suffering from "longstanding and quite significant" depression, "moderate brain damage," and learning disabilities. Dr. Shore believed Cervantes's drug use partly explained his behavior that night, and he was allowed to

11

testify to Cervantes's drug and alcohol history. He opined that Cervantes's substance abuse may have contributed to his brain damage, along with lack of oxygen at birth and "multiple minor head injuries." Dr. Shore accepted as a fact that Cervantes had taken psilocybin mushrooms on the night of his crimes. His opinion was based on brain damage, psychedelic drug ingestion, and depression; no single factor could be considered the cause of the psychotic episode.

Dr. Stalcup, a physician specializing in addiction medicine, also conducted an examination of Cervantes, focusing on the effect of hallucinogenic drugs on someone with his specific cognitive impairments, as described by Dr. Shore. Assuming Cervantes consumed psilocybin mushrooms on the night of the crimes, Dr. Stalcup endorsed Dr. Shore's opinion and concluded that Cervantes's alcohol and drug use caused an organic psychosis and Cervantes attacked his victims in a dissociative state. His opinion relied on Dr. Shore's report and on Cervantes's report of having taken psilocybin mushrooms that night. He was not allowed to testify that Cervantes was, in fact, using psilocybin mushrooms that night. He also thought Cervantes was "possibly" under the influence of MDMA. Dr. Stalcup also opined, however, even without psilocybin mushrooms, Cervantes's alcohol and marijuana use alone, combined with the deficits revealed in the SPECT scan, would have led to organic psychosis.

## C.    The Motion for a New Trial

On April 16, 2013, Obstler filed a motion for a new trial. Evidentiary hearings were conducted over the next several months, and on October 18, 2013, the court denied the motion. In addition to expert psychological testimony from Drs. Shore and Stalcup,[8] summarized above, Obstler called his legal expert, Coffer, to testify as an expert witness on competency of criminal defense counsel. (See fn. 7, *ante*.) In a lengthy written report

---

[8] Drs. Shore and Stalcup wrote reports summarizing their findings and opinions, but the trial court would not admit either report into evidence because they both contained hearsay. The judge's hearsay rulings in connection with expert testimony in these reports and in the hearing itself were, for the most part, consistent with *People v. Sanchez* (2016) 63 Cal.4th 665, 674–686.

12

with multiple attachments, as well as in testimony on the new trial motion, Coffer catalogued the errors and omissions he saw in Kirkpatrick's preparation for trial and trial strategy, and ultimately opined that Kirkpatrick had provided ineffective assistance of counsel. Obstler also called as witnesses two mental health experts retained by the defense before trial, as well as Kirkpatrick, Pendergast and Barton, and two of Kirkpatrick's superiors in the Conflict Defender's Office. The testimony will be summarized below, in the unpublished section of the opinion.

The trial court denied Cervantes's motion for a new trial, finding Kirkpatrick credible and her decisions "competently made based upon the information she had at the time." The court further found that, had the defense presented at trial the evidence presented in the new trial motion, "there is no reasonable probability that a different result would occur." The mental health evidence had included an "[atypical] obsession with sex and violence and lack of control and behavioral problems" and, had it been presented to the jury along with "the actual horrific facts of the crime itself," it "would have been absolutely devastating to the defense." The court also opined that "more evidence of voluntary intoxication through marijuana and psychedelic mushrooms" would not have resulted in a more favorable verdict for Cervantes.

### D. Sentencing

On October 28, 2013, the court sentenced Cervantes to 50 years to life for two of the sex crimes under the one-strike law (two consecutive terms of 25-to-life), plus 11 years imposed consecutively for the attempted murder of I.A., plus an additional consecutive life term for the attempted murder of A.P. The remaining counts were either imposed concurrently or stayed under section 654. Thus, Cervantes's aggregate sentence was 61 years to life, plus a consecutive life term. Importantly, the longest terms were attributable to the sex offenses under the one-strike law, four of which were general intent crimes (rape, sodomy and two counts of oral copulation). Under section 667.61, Cervantes was not awarded any credits for good conduct before sentencing. (See section II.C.2.c., *post*.) The probation officer had calculated Cervantes's exposure at four life sentences without possibility of parole, plus an indeterminate term of 155 years to life

and a determinate term of 15 years, 4 months. The judge stayed many of the potential sentences on various counts of conviction and enhancements in an effort to bring the sentence within the limits established by *Graham*, *supra*, 560 U.S. at page 74 and *Caballero*, *supra*, 55 Cal.4th at page 268. Through its comments at sentencing and the many sentencing choices it made, we believe the court fairly clearly expressed its intention to impose a life sentence with the highest minimum term it could, while avoiding an unconstitutional sentence under *Caballero*.

## II.    DISCUSSION

### A.    Ineffective Assistance of Counsel

#### 1.    Cervantes's Claims of Ineffective Assistance

Still represented by Obstler and his firm on appeal, Cervantes contends Kirkpatrick was constitutionally ineffective in representing him, pointing out numerous errors she allegedly made. He claims that, in combination, these errors amounted to a complete failure to subject the prosecution's case to meaningful adversarial testing.

First, Cervantes argues trial counsel failed to adequately investigate certain details of the case, specifically she (1) failed to consult with Cervantes's two prior attorneys, who could have informed her of their investigation to date and their theories of the case; (2) failed to follow up on crime scene photographs that showed a bicycle in the garage of the home where the attacks occurred, which defense counsel claims would have bolstered Cervantes's story that he entered Gabriel's house to retrieve his bike; (3) failed to follow up on crime scene photos that showed there was no forcible entry into the house; (4) failed to investigate the route Cervantes took in arriving at Gabriel's house; (5) failed to investigate other forensic evidence, specifically five cigarette butts, a beer can, and footprints outside the home that showed they were made before Cervantes entered the house, not afterwards, and therefore tended to undercut the prosecution's theory of the crime; (6) failed to subject the prosecution's revenge theory to adversarial scrutiny or investigation; (7) failed to investigate Gabriel's "exculpatory" statement to police about Cervantes's revenge motive; (8) failed to investigate or present evidence about who "Richard" was; and (9) abandoned an involuntary intoxication/drug psychosis defense

14

based on consumption of psilocybin mushrooms laced with MDMA, based largely on a negative urine test conducted after Cervantes's arrest, which Cervantes claims was unreliable and an insubstantial basis for rejecting the mushroom defense.

Second, he claims Kirkpatrick failed to adequately communicate with or prepare her expert witnesses, which caused her to "abandon[] important mental health and cognitive brain evidence that was not only material but crucial to the jury's determination" of the specific intent required for many of the alleged offenses. Specifically, she cut off communication with Dr. Roderick Pettis, an expert psychiatrist hired by the defense, without even securing a copy of his detailed notes of an interview he had conducted with Cervantes. She also failed to obtain a recommended brain scan for Cervantes. And, when informed shortly before trial by a different defense expert, Dr. John Podboy, a clinical and forensic psychologist, that Cervantes may have been in a "dissociative state" at the time of the crimes, she decided not to call that expert as a witness and went to trial without investigating further.

And third, Cervantes contends the defense that Kirkpatrick did put on through Zehnder's testimony was not a legally viable voluntary intoxication defense, primarily because she did not choose an appropriate expert to explain why his state of intoxication would have negated Cervantes's formation of the specific intent required for the various crimes.[9] Zehnder testified primarily about the physical effects of alcohol intoxication, such as slurred speech and impairment of motor skills. We agree with Cervantes that he would have been better served if Kirkpatrick had called a neuroscience expert[10] who

---

[9] Cervantes also argues there were evidentiary errors at the hearing on his motion for a new trial that compromised the outcome of the motion. In light of our disposition on his claims of ineffective assistance of counsel, we do not separately address those claims, but we do address some of the claims of evidentiary error in our discussion of ineffective assistance of counsel.

[10] When we use the term "neuroscience expert" we include any professional who has specialized knowledge of brain function and impairment.

15

could have testified about the mental effects of alcohol intoxication and perhaps psilocybin intoxication on a person with Cervantes's apparent cognitive deficits.

Where, as here, the trial court has denied a motion for a new trial based on an ineffective assistance claim, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts demonstrate a violation of the right to effective counsel.  (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

We agree with Cervantes that trial counsel should have done more to investigate leads developed by Pendergast and Barton.  Kirkpatrick's limited investigation of a psilocybin mushroom defense fell below the standard of objectively reasonable representation.  Her minimal and ineffective communication with defense-retained experts caused her to make an uninformed decision in rejecting a theory of cognitive impairment as part of her voluntary intoxication defense.  She chose as her only expert witness someone who was not qualified to opine on the mental impacts of extreme alcohol intoxication, much less on the combined effects of alcohol and psilocybin mushrooms on someone with Cervantes's brain impairment.

Because Kirkpatrick's performance leaves us without confidence in the outcome of the trial on the specific intent crimes other than burglary, we hold she was constitutionally ineffective.  We therefore reverse the eight counts specified in the disposition.  On the general intent sex offenses, assault with a deadly weapon, and burglary charges, however, we are satisfied Cervantes got a fair trial with a reliable result, and we affirm.

### 2.     *This Case is Governed by* Strickland*, not* Cronic.

In arguing that Kirkpatrick failed to subject the prosecution's case to "adversarial testing," Cervantes attempts to bring himself within the exception identified in *United States v. Cronic* (1984) 466 U.S. 648, 659 (*Cronic*) that allows reversal for ineffective assistance of counsel without a showing of prejudice where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing" so as to make "the

16

adversary process itself presumptively unreliable." *Cronic* recognized this exception would apply only to an extreme deviation from the norm. (*Id.* at pp. 656–657.) To come within the exception, the United States Supreme Court has explained, counsel's failure to represent the defendant must be "complete." (*Bell v. Cone* (2002) 535 U.S. 685, 697.) The California Supreme Court has also deemed the *Cronic* exception to be extremely limited: "Defendants have been relieved of the obligation to show prejudice only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage." (*In re Visciotti* (1996) 14 Cal.4th 325, 353; see also, *Florida v. Nixon* (2004) 543 U.S. 175, 190 ["narrow exception"].)

Cervantes's case does not come close to meeting the requirements for the *Cronic* exception. Defense counsel filed motions in limine, gave an opening statement, made objections, cross-examined witnesses, presented two witnesses on behalf of the defendant, requested jury instructions, and made a closing argument to the jury. She succeeded in convincing the jury to make not true findings on several of the one-strike allegations, including infliction of great bodily injury, torture and aggravated mayhem. Kirkpatrick made a motion for a new trial based on insufficiency of the evidence on the specific intent crimes. She also filed a sentencing memorandum and assembled a large packet of letters of support for Cervantes in anticipation of sentencing. *Cronic*'s reversible per se standard does not apply. In a case subject to the *Cronic* exception, these hallmarks of legal representation would be markedly absent or almost absent. (*People v. Williams* (2013) 56 Cal.4th 630, 690–691.)

Instead, *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*) provides the guiding principles, and it requires a showing of both deficient professional performance and prejudice. (*Id.* at p. 687.) On the performance prong, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*id.* at p. 689), and measure counsel's performance against an "objective standard of reasonableness" (*id.* at p. 688). To establish deficient performance under *Strickland*, a defendant must show his or her attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

17

Amendment." (*Id*. at p. 687.) To show prejudice, he must show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Ibid*.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

Although we usually require that claims of ineffective assistance of counsel be raised in a petition for writ of habeas corpus (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267), because the ineffective assistance of counsel claim was fully developed in the trial court on a motion for a new trial, we shall entertain the issue in this appeal, applying the *Strickland* test.

3. *Cervantes's Claims of Ineffective Assistance Do Not Affect the Jury's Verdicts on the General Intent Crimes: Forcible Rape, Forcible Sodomy, Forcible Oral Copulation, and Assault with a Deadly Weapon.*

By far the strongest of Cervantes's ineffective assistance claims is that trial counsel failed to bring certain evidence before the jury that might have caused one or more jurors to doubt that Cervantes had formed the specific intent required for some of the offenses, either because of alcohol and possibly psilocybin mushroom ingestion or because of cognitive impairment or brain damage, or especially because of those factors in combination. He claims, in essence, that Kirkpatrick could have and should have presented a stronger case of diminished actuality.[11]

Diminished actuality evidence is limited by statute. "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) Likewise, "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).)

Thus, diminished actuality is available only to disprove or cast doubt on mens rea in specific intent crimes. Cervantes makes reference to *involuntary* ingestion of MDMA in an apparent attempt to extend his challenge to the validity of the general intent

---

[11] In the trial court, counsel referred repeatedly to a "mental capacity defense" and in this court continues to use the same language, questioning whether Cervantes had the mental *capacity* to form the specific intent required for the various crimes with which he was charged. The defense of diminished capacity has been abolished in California. (§§ 25, subd. (a), 28, subd. (b).) (See fn. 23, *post*.) We therefore construe Cervantes's arguments as they might apply to a defense of what is now typically called "diminished actuality." (See *People v. Elmore* (2014) 59 Cal.4th 121, 139.)

crimes,[12] but we reject that argument as a matter of law.  Since he claims to have taken psilocybin mushrooms voluntarily, the fact that they may have been, unknown to him, tainted with MDMA would not render the MDMA intoxication "involuntary."  (*People v. Gallego* (1990) 52 Cal.3d 115, 183–184; *People v. Velez* (1985) 175 Cal.App.3d 785, 795-797; CALJIC No. 4.23.)

Kirkpatrick's alleged failings would not have led to a different verdict on the general intent crimes.  It is significant that four of the one-strike crimes (forcible rape, forcible sodomy, and two counts of forcible oral copulation) were general intent crimes.  (*People v. DePriest* (2007) 42 Cal.4th 1, 48 [forcible rape]; *People v. Warner* (2006) 39 Cal.4th 548, 557 [rape, sodomy, oral copulation]; *People v. Hughes* (2002) 27 Cal.4th 287, 341 [sodomy]; *People v. Fox* (2001) 93 Cal.App.4th 394, 398 [oral copulation with a child under age 14].)  Presenting more mental state evidence would not have affected those verdicts.  We therefore shall affirm the convictions on counts 11 through 14.

In addition, the two counts of assault with a deadly weapon (counts 8 and 9) required only general intent.  (*People v. Colantuono* (1994) 7 Cal.4th 206, 214.)  Those convictions shall also be affirmed.

### 4. *Counsel's Alleged Failures Were Not Prejudicial on the Burglary Conviction or the Burglary One-Strike Findings.*

Some of Cervantes's claims of error by counsel are relevant solely to the burglary charge.  Indeed, the burglary charge was especially significant because the 25-to-life terms were based in part on the fact that the sex crimes occurred during a burglary.  (§ 667.61, subds. (a), (d)(4), (e)(2).)  But we find none of the purported errors of counsel had any impact on the burglary conviction or the true findings on the burglary one-strike allegations.

### a. Photograph of Cervantes's Bicycle in Gabriel's Garage

Cervantes filed a declaration under oath attached to the new trial motion in which he said that, after returning home from the party, he meandered about for a while and

_____

[12] Cervantes does not claim he was unconscious.  (§ 26.)

20

ended up at Gabriel's house. Once there, he remembered he had left his bicycle at Gabriel's house sometime earlier, so he decided to retrieve it. Relying on the declaration, Cervantes claims his trial attorney was ineffective for failing to recognize the significance of a photograph in evidence of Gabriel's family's garage, which shows the presence of Cervantes's bicycle. Cervantes claims this point could have been made without his testimony, as family members could have testified it was his bike in the photograph. But his intent to retrieve the bike could only have come to the jury through his own testimony.

It is next to meaningless that Cervantes's bike was, in fact, at Gabriel's house. It does not, as Cervantes suggests, negate revenge as a motive for the crimes. Even if the bike photograph could explain his intent in entering the garage, it would not explain his intent in entering the home or the master bedroom. (See *People v. Thomas* (1991) 235 Cal.App.3d 899, 903–906 [entry from garage into locked kitchen was burglary].) The bike story was ultimately of only the slightest relevance and could not have been fleshed out without putting Cervantes on the witness stand, which neither Kirkpatrick nor Cervantes favored.

b. Photograph Showing There Was No Break-in

Similarly, we attach no significance to the fact that one photo of damage to the frame of the door leading into the garage, examined closely, showed the damage had been sustained at an earlier time. Cervantes claims this calls into question whether he actually had to forcibly enter the family's home or whether the door was unlocked. The interior door from the garage to the house was not damaged and apparently had been unlocked.

Cervantes overestimates the importance of the photograph. It does not matter whether he broke into the house or walked in through an unlocked door. "[I]n California no breaking or forcible entry is required in proof of the commission of a burglary." (*People v. Beamon* (1968) 268 Cal.App.2d 61, 65; accord, *People v. Davis* (1998) 18 Cal.4th 712, 720–721.) A burglary conviction requires that the defendant entered a building or room with the intent to commit a theft or a felony. (*People v. Wallace* (2008)

21

44 Cal.4th 1032, 1077; CALCRIM No. 1700.) Unauthorized entry through an unlocked door constitutes burglary. (*People v. McCormack* (1991) 234 Cal.App.3d 253, 254-257.) Moreover, the illegal intent may be formed after entry into a building and before entry into a room where the illegal act is committed. (*Id*. at pp. 255–257; see *People v. Sparks* (2002) 28 Cal.4th 71, 88 [entry by houseguest into unlocked bedroom of victim with intent to commit rape].) The lack of forcible entry was irrelevant.

                c.      Footprints, Beer Can and Cigarette Butts Outside the Home

Among the evidence found at the crime scene were a beer can and five cigarette butts outside the home near some footprints in the ashes that had fallen from a barbecue onto a pathway to the door leading into the garage. The prosecution used this evidence to suggest that Cervantes, after entering the house, left again to drink a beer and smoke a cigarette outside. A police officer testified the shoe prints in the ash matched Cervantes's shoes. The prosecutor suggested this was evidence of premeditation and deliberation because it gave Cervantes time to reflect on the crime he was about to commit. Cervantes pointed out in his motion for a new trial that footprints in the ash led *toward* the door to the garage, not away from it, thus suggesting he smoked the cigarette and drank the beer *before* entering the house, not afterwards. On appeal he argues the footprints could have been left by someone other than Cervantes.

Even if trial counsel had made a point of trying to prove the officer was wrong, that would not cast doubt on who committed the crimes. Cervantes obviously committed the charged acts and never tried to point the finger at anyone else. Distracting the jury with a largely irrelevant argument about when the footprints were made or by whom would not have changed the outcome of the trial. There was far more evidence of premeditation and deliberation than footprints in the ashes.

Whether he smoked and drank a beer before entering the home or afterwards, the evidence still shows he spent appreciable time outside the home, which would have given him an opportunity to contemplate his crimes. In fact, if he took this time *before* entering the home, it strengthens the prosecution's evidence of burglary because it tends to increase the likelihood he entered with felonious intent. We fail to see how stressing to

the jury the direction in which the footprints were pointing, or questioning whether they were made by a third party, could have significantly improved Cervantes's defense, and it might well have had the opposite effect.

d. Failure to Investigate Cervantes's Route to Gabriel's House

We likewise find it difficult to imagine the jurors' verdicts would have been different if they had known which route Cervantes followed when he walked to Gabriel's house. Cervantes argues the circuitous route he followed was more consistent with a dazed "walkabout" than a deliberate trip to a known destination intent upon committing a crime. He seems to suggest this would have helped to blunt the evidence that he had a knife with him, suggesting it diminishes the inference he brought the knife along for the purpose of stabbing someone. Evidence of his exact route would have been weak evidence, at best, in his defense. And it could only have been presented through Cervantes himself, who did not want to take the stand. Putting him on the stand to prove this non-issue would have opened him up to cross-examination that could have had a severe negative impact on his defense. The risk was great and the potential reward trivial. This omission did not meet the showing required under the first prong of *Strickland*.

e. Cervantes's Own Declaration Shows He Entered the House to Steal Alcohol.

Although Cervantes seems to assume his potential alcohol/mushroom intoxication and cognitive impairment/brain damage defenses would apply equally to all the specific intent crimes, we find an exception for the burglary conviction. His own declaration explicitly describes how he entered the house, including the detail that the door stuck a little bit as he opened it, though it was unlocked. The declaration also explains why he entered: he entered the garage to retrieve his bicycle, and he entered the house to drink some of Gabriel's mother's alcohol that he expected to find in the freezer. This shows not only that he was clear-headed enough at the time of the burglary to form a specific intent, but also that the specific intent he formed was larcenous. Even entering to steal alcohol would amount to a burglary. (§ 459 [burglary is committed by entry "with intent

23

to commit grand or petit larceny or any felony"]; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1572 [intent to commit petty theft sufficient]; *People v. Nguyen* (1995) 40 Cal.App.4th 28, 30–31 [petty theft by false pretenses].) Cervantes's declaration amounts to a confession of burglary, and we see no reason to reverse the conviction on that count or on the burglary one-strike findings.

This conclusion does not pre-ordain his guilt of the later specific intent crimes, however. The burglary was the first crime chronologically and was evidently committed when Cervantes still had his wits about him sufficiently to form a specific intent. Cervantes insists that he remembers virtually nothing after entering the house, stumbling, and falling in the kitchen. He evidently stayed at the house quite some time before attacking the children, time enough to consume three more beers. Thus, it is possible he entered a dissociative state sometime after entering the house but before attacking the children. This would not excuse him from the general intent crimes, or the burglary, or the burglary one-strike findings. He still committed the sex offenses "during the commission of a burglary" within the meaning of section 667.61, subdivision (e)(2). (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 191 ["during the commission of a burglary" includes the entire duration of the burglary, from "initial entry with the requisite intent [until] the burglar's escape to a place of temporary safety"]; *People v. Palmore* (2000) 79 Cal.App.4th 1290, 1295–1296 [same].) Therefore, based on Cervantes's own declaration, we affirm the burglary conviction and the burglary one-strike findings accompanying the general intent crimes.

5.      *Failure to Investigate and Present Evidence Regarding the* Calkins *Case and the Tainted Mushroom Defense Was a Legitimate Tactical Decision.*

Cervantes claims Kirkpatrick was ineffective because she failed to investigate and present evidence regarding the *Calkins* case. He claims this line of investigation was important to dispel the notion that the attack was committed as "revenge" for Gabriel's supposedly "snitching" on "Richard" because the revenge theory gave the prosecution a basis for arguing that Cervantes harbored a felonious intent when he entered the house

24

(§ 459), supported the torture allegations (§ 206),[13] and bolstered the People's case for premeditation and deliberation on the attempted murder charges (§§ 187, 664). He claims Kirkpatrick performed below professional norms by failing to investigate his claim that he ingested psilocybin mushrooms—specifically mushrooms tainted with MDMA—shortly before committing the crimes. He draws a connection between his case and *Calkins*, claiming that both he and Calkins got their mushrooms from Gabriel, and the mushrooms were tainted with MDMA.[14]

Cervantes further claims that Kirkpatrick missed an opportunity to rebut the prosecution's revenge theory by failing to investigate and present to the jury evidence of a litany of "facts" supported only by Coffer's report: "(1) The 'Richard' referred to by A.P. was Richard Calkins, a young man who was facing trial on a double homicide that involved behavior as violent and bizarre as that of [Cervantes]; [¶] (2) Calkins was defending on the theory that he consumed hallucinogenic mushrooms laced with MDMA after purchasing the drugs from [Gabriel]; [¶] (3) [Gabriel] had been arrested in connection with the Calkins case after the police found hallucinogenic mushrooms in his house that were laced with MDMA; [¶] (4) Calkins and [Cervantes] had never met and [Cervantes] had no idea who Calkins was or what his relationship was to [Gabriel]; [¶] (5) [Cervantes] purchased hallucinogenic mushrooms from [Gabriel] around the same time that Calkins purchased the drugs; [¶] (6) [Cervantes] told his lawyers that just before leaving the house on his walk that night he ingested the mushrooms that he had purchased from [Gabriel]; [¶] (7) [Gabriel] admitted and had written incriminating notes

---

[13] Torture requires proof the defendant inflicted great bodily injury on someone, and when inflicting the injury, he "inten[ded] to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) Since Cervantes stabbed A.P. 42 times and I.A. 13 times, the jury reasonably could have found he did so for a sadistic purpose or for revenge.

[14] Barton also discussed with Calkins's attorney sharing an expert: Dr. Stalcup. Barton was proceeding on the theory that both Calkins and Cervantes got their mushrooms from Gabriel. Her notes produced in discovery contained no mention of this fact, but she testified they were not her complete notes.

25

about his dealing of mushrooms; [¶] (8) Photographs taken at the crime scene showed a newspaper article about the Calkins crime next to the bed where the victims were sleeping when [Cervantes] committed the acts;[15] [¶] (9) Prior to the night of the crime the victims' family had grown concerned about a report that men had been around their house looking for [Gabriel]; and [¶] (10) Calkins was being represented by the Public Defender and that representation provided the most reasonable basis for the Public Defender's decision to declare a conflict in [Cervantes's] case."

Drawing together the many strands of this theory of ineffective assistance of counsel, the nub of it appears to be that Kirkpatrick should have investigated the *Calkins* and tainted mushroom connections further to support a diminished actuality defense based on voluntary intoxication (alcohol, marijuana and mushrooms), and perhaps involuntary intoxication (MDMA), while simultaneously dispelling any inference he attacked Gabriel's siblings out of revenge against Gabriel on Calkins's behalf. Although the theory has some surface appeal and internal coherence, when considered as a whole, its individual parts are not supported by admissible evidence. Besides, Kirkpatrick had adopted a directly contrary strategy. When the prosecutor attempted to elicit information from a police witness about who "Richard" was, Kirkpatrick successfully moved to strike his comment that Richard had some connection to "an earlier Vacaville case." She evidently believed introducing the *Calkins* case into Cervantes's trial would merely help to flesh out the prosecution's revenge theory.[16]

---

[15] Cervantes cites this newspaper article as something the defense attorney should have used to draw a connection with the *Calkins* case. We reject this claim along with rejecting the entire *Calkins* connection as something Kirkpatrick was obligated to present at trial as part of a competent defense.

[16] Several hours after Cervantes's arrest the police interviewed Gabriel at juvenile hall and he told them various things that Cervantes now claims were "exculpatory." Cervantes claims Kirkpatrick's response to this interview was ineffective assistance of counsel. But Gabriel's statements amounted to nothing more than his incredulity that Cervantes would or could commit such crimes because he was normally nonviolent, his inability to identify any motive for Cervantes's attack on his siblings, and his suggestion

26

Kirkpatrick explained her reasons for not developing a *Calkins* defense: "[T]he theory that was presented at trial was just [A.P.'s] statement, and that was it. So whoever this Richard was not presented at trial or the relationship of whoever Richard was." Kirkpatrick did not investigate who Richard was because she "was not going to give them a motive, no." While we question how a failure to investigate can be justified by the evidence actually presented at trial, we fail to see any prejudice flowing from Kirkpatrick's failure to investigate. We ultimately agree with her that there was no need to rebut the revenge theory because the prosecution "didn't present anything at trial, who Richard was or Richard Calkins's case."

In cross-examining A.P., Kirkpatrick succeeded in getting her to admit she "possibly" heard something about "Richard" on the news or read something on the Internet. Exposing the jury to that much connection to the *Calkins* case, but no more, tended to call into question A.P.'s testimony about Cervantes's purported "revenge" statement. We are convinced Kirkpatrick had a strategically logical approach to dealing with the revenge theory.

---

that maybe Cervantes had been on "drugs." His statements would have been inadmissible lay opinion and speculation. (Evid. Code, §§ 702, 800.)

Kirkpatrick testified she did not interview Gabriel, but she did watch the video-taped police interview of him. Kirkpatrick did not attempt to interview Gabriel because he was the older brother of the two victims, who would have been unlikely to cooperate. It also appears Gabriel was represented by counsel at the time, which was another reason not to interview him.

Cervantes suggests Kirkpatrick should have called Gabriel as a witness, which could have been disastrous. If she had, the prosecutor could have used other distinctly unfavorable parts of the interview. (Evid. Code, § 356.) Gabriel told the police he himself had never used mushrooms, did not know whether Cervantes used mushrooms, and denied selling mushrooms to Cervantes. In addition to his other negative statements about Cervantes (see fn. 2, *ante*), Gabriel told the police Cervantes "lies," was "not honest," "not a trustworthy person," and a "weirdo" who was "mean to his mom," "steals from friends" and was "always jacking off." We cannot see the value of calling Gabriel as a witness.

27

In closing argument, Kirkpatrick used the prosecution's lack of evidence connecting Cervantes to "Richard" to try to convince the jury to dismiss the prosecutor's revenge theory: "The District Attorney has said over and over again, 'We know what his intent was,' right? 'We know what his intent was because he told the victim, "This is for your brother snitching. This is for your brother snitching." ' And she mentioned a name by the name of Richard. [¶] Okay. Where is—where is the evidence of that? Where is— where is the evidence of the snitching? Who is this Richard guy? Who is he in relationship to Alex? It's the rambling of a kid who's really drunk. Where is that evidence? They want you to rely solely on this statement, but it means nothing. Unless you have something to show what it means, it means nothing. They're just hoping you held onto it and go, That's it. That's it. It's revenge. You have no evidence of that. Revenge for what?" We are not inclined to second-guess this mode of handling A.P.'s testimony about Richard.

Whether to pursue the complicated, speculative *Calkins*/tainted mushroom defense was a tactical decision lying within the realm of professional judgment. Kirkpatrick's decision not to pursue the defense was reasonable. The most significant evidence underlying the *Calkins*/tainted mushroom defense was absent or conflicting. Gabriel denied selling him the mushrooms, and Cervantes himself had given conflicting accounts of where he got them. There was also a negative drug test for both psilocin (the active ingredient in psilocybin mushrooms) and MDMA.[17]

That counsel on appeal has developed a new, alternative theory of defense does not mean the course chosen by Kirkpatrick was professionally incompetent. The *Calkins*/tainted mushrooms defense could not have been established without Cervantes's testimony. But based on his inconsistent prior statements about the source of the mushrooms, Cervantes would have been vulnerable on cross-examination. Especially given her client's cognitive challenges, Kirkpatrick was justifiably worried about his

---

[17] According to Dr. Stalcup, both MDMA and psilocin leave the body quickly and are difficult to detect in available tests.

ability to withstand cross-examination. We also take judicial notice of the fact that Calkins in his own trial was not allowed to introduce evidence of a connection to Cervantes's case. (Evid. Code, §§ 452, subd. (d), 459.) We have no faith that Judge Kinnicutt would have been any more receptive to a "*Calkins*" defense, so prejudice from deciding not to pursue such a defense would be difficult to establish.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689.) A "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Ibid*.) "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Ibid*.; see also *Harrington v. Richter* (2011) 562 U.S. 86, 106 (*Richter*) [Ninth Circuit's grant of habeas relief overturned by Supreme Court where California court had held a defense attorney was not ineffective despite failure to consult forensic blood experts or introduce expert evidence].)

Finally, presenting evidence of the *Calkins* connection might have hurt Cervantes's case by confirming the revenge motive. Gabriel had confessed to the police that he sold mushrooms to Calkins, which the jury could have inferred was the "snitching" that A.P. testified about. The jurors may have concluded that Cervantes believed Gabriel had "snitched" on Calkins by admitting to the police that he sold Calkins the mushrooms, and Cervantes may have been afraid Gabriel might also "snitch" on him for his drug activity. Thus, developing a connection between the two cases may have backfired by clarifying and strengthening the prosecution's revenge theory. Such potential downsides to following a given course are properly taken into account in addressing a claim of ineffective assistance of counsel. (See *Richter*, *supra*, 562 U.S. at pp. 107–110.) We cannot say defense counsel was ineffective for failing to follow the path that Coffer would have taken.

29

6. *Abandonment of the Mushroom Defense Without Further Investigation Was Objectively Unreasonable, But Was Not By Itself Prejudicial.*

The mushroom defense standing alone is on different footing. The two Conflict Defenders who represented Cervantes before Kirkpatrick took over the case had contemplated raising a defense based on ingestion of psilocybin mushrooms. Pendergast had a sample of Cervantes's blood and urine sent to a laboratory for testing. The blood had been drawn and urine collected some seven or eight hours after Cervantes claims he ingested the mushrooms. Pendergast was awaiting the results when he left the office. The lab results came in while Barton was defending Cervantes (in June 2011), and the urine was negative for psilocin (the blood apparently having not been tested). According to Coffer, Kirkpatrick had rejected the mushroom defense by late February 2012, just two weeks after being assigned to the case. [18]

A significant factor in her rejection of the mushroom theory appears to have been the negative psilocin test. Based on Coffer's Internet research and contacts with the lab, he learned it is difficult to test for psilocin because it leaves the body rapidly after ingestion, a fact confirmed by Dr. Stalcup. Such tests almost invariably show up negative. Kirkpatrick never communicated with the laboratory, except to ask for a copy of the lab report, and apparently never learned of the shortcomings of the test. We agree with Cervantes that Kirkpatrick should not have ruled out a mushroom defense based solely on the results of an unreliable urine test at a time when she had no other clear alternative defense.

Kirkpatrick considered the evidence supporting a psilocybin mushroom defense to be conflicting, but this seems to be largely because Cervantes did not tell her in their initial interview that he had taken mushrooms. She acknowledged he later told her about it, but Kirkpatrick seemed to doubt his credibility. Kirkpatrick testified Cervantes's

---

[18] Although we see a number of serious deficiencies in Kirkpatrick's investigation, as explained below, we reject the suggestion that her failure to communicate with former counsel was in and of itself ineffective assistance of counsel.

statements "were inconsistent and all over the place." We disagree with that characterization. Where he got the mushrooms, it is true, was a subject of some conflicting information from Cervantes, but the fact that he took them was consistently reported.

We are especially concerned that Kirkpatrick failed to secure from Dr. Pettis, his notes of an interview conducted on November 14, 2011 (before Kirkpatrick came onto the case), in which Cervantes's reported to Dr. Pettis that he had consumed mushrooms on the night of the crimes and got them from Gabriel. These detailed notes, some 18 single-spaced, typed pages in length, prepared by Dr. Pettis while working for the defense, surely should have been acquired by Kirkpatrick,[19] yet Kirkpatrick never received a copy because she did not ask for them. Dr. Pettis never told her he had interview notes, but a reasonably competent defense attorney would have asked. To this extent we find her performance fails the first prong of *Strickland*. Dr. Pettis's detailed notes of his interview with Cervantes would have given her greater insight into the case and could have caused her to rethink the mushroom defense or even the *Calkins* connection.

Kirkpatrick claimed she had "absolutely no evidence" that Cervantes had taken mushrooms that night. That may be true in the sense that she had no admissible evidence to produce at trial, but for purposes of investigation, her client's repeated statements were

---

[19] When Obstler attempted to move the notes into evidence, the court sustained a relevance objection because Kirkpatrick had not been provided with the notes. The relevance objection should have been overruled. The notes were admissible as evidence of what Kirkpatrick could have discovered from a defense-retained expert if she had asked. As such, the notes are relevant, not for the truth of what they say, but for the added information Kirkpatrick would have gleaned had she exercised reasonable professional diligence. We are aware we must "eliminate the distorting effects of hindsight" in assessing Kirkpatrick's performance. (*Strickland*, *supra*, 466 U.S. at p. 689, accord, *Richter*, *supra*, 562 U.S. at pp. 106–107.) Still, an attorney cannot immunize herself from a claim of ineffective assistance of counsel simply by avoiding the acquisition of readily available information. Dr. Pettis's notes are included in the record before us, and we have reviewed them on appeal.

evidence enough. Cervantes signed a post-trial declaration under oath stating he ate a piece of a psilocybin mushroom just before going to Gabriel's house on the night of his crimes and he got the mushroom from Gabriel at some earlier point in time.[20] He also told Kirkpatrick some version of a mushroom ingestion story before trial. In addition, his bizarre conduct during the crime itself should have raised some concerns about drug intoxication; the experts have since confirmed that his behavior was consistent with ingestion of psilocybin mushrooms in combination with other factors. Following up on her client's statements, by consulting an expert or otherwise, was necessary for her to learn: (1) the significance (or insignificance) of the negative psilocin test; and (2) the effect psilocybin mushrooms might have had on Cervantes's ability to form specific intent, if in fact he had consumed them. Some form of further investigation was required of competent counsel before rejecting the mushroom defense.

But Kirkpatrick had a second problem with the defense: proving Cervantes ate the mushrooms. Since he took them at home, not at the party, there were no witnesses. Barton, too, recognized that unless she could get a positive psilocin test from Cervantes's blood sample, Cervantes would have to testify. Kirkpatrick rejected the prospect of putting Cervantes on the stand because (1) he did not want to testify, (2) she was concerned about how he would hold up under cross-examination, and (3) she was concerned he might perjure himself. These were all legitimate reasons for rejecting use of the mushroom defense at trial *after* conducting an appropriate investigation and consulting with her client. But they do not excuse her failure to investigate. An appropriate investigation is prerequisite to providing competent counseling to the client about his decision to testify or stand mute.[21]

---

[20] The judge clearly placed little or no credence in that declaration unless Cervantes was willing to testify at the hearing.

[21] Coffer suggested trial counsel was ineffective for failing to call her own client as a witness, going so far as to testify that not putting Cervantes on the stand was "absolutely death for the defense." Though Coffer criticizes Kirkpatrick, it is both ironic and telling that Obstler himself did not call Cervantes as a witness at the hearing on the

32

We conclude that Kirkpatrick failed to conduct a reasonable investigation into the mushroom defense, but we would not find that failure prejudicial standing on its own. Because the mushroom defense could only be established by putting Cervantes on the witness stand, and because there were good reasons for not doing so, the failure to present a mushroom defense was not ineffective assistance of counsel. We doubt Kirkpatrick's advice to Cervantes about testifying would have changed even if she had investigated further. Thus, the failure to investigate was not individually prejudicial. When combined with the failure to adequately investigate other aspects of Cervantes's mental state at the time of the crimes, however, this failure contributes to our unease with the verdicts on the specific intent crimes.

7. *Failure to Adequately Investigate Potential Expert Testimony on Mental State Was Prejudicial on the Specific Intent Crimes: Attempted Murder, Torture, Aggravated Mayhem, and Two of the Sex Offenses.*

a. The Importance of Pretrial Investigation

Cervantes contends Kirkpatrick failed to communicate effectively with her experts, which led her to sacrifice a viable diminished actuality defense to the specific intent crimes based on his long-term cognitive difficulties and brain damage. This claim, together with the mushroom defense or even with the alcohol intoxication defense, could have helped Cervantes defend against the specific intent crimes. Cervantes contends, if Kirkpatrick had been more receptive to and communicative with her hired experts, she would have learned that Cervantes's cognitive impairment might be linked to organic brain damage, which would have led her to order a brain scan. Had she consulted with Dr. Shore or a similar mental health expert, she would have learned Cervantes's brain was "diffusely damaged," with impairment specific to his prefrontal cortex.

---

new trial motion, even though the judge told him repeatedly that only by putting Cervantes on the stand could he prove mushroom ingestion. But, of course, the decision whether to testify is ultimately the client's. (*People v. Robles* (1970) 2 Cal.3d 205, 215; *People v. Gray* (1998) 66 Cal.App.4th 973, 987–988.)

We cannot ignore or condone these shortcomings in Kirkpatrick's investigation. It appears Kirkpatrick repeatedly misheard or misinterpreted advice given by the experts, often enough that we cannot help but conclude she did not serve her client competently. It appears she was so concerned about the negative evidence in Cervantes's IEP records that she ruled out presenting a mental health expert without due consideration. Had she been more receptive to mental health testimony—receptive enough to at least listen to her own hired experts carefully, get copies of their notes, and follow up on their leads—it might have made a difference in how she presented the alcohol intoxication defense. That, in turn, is reasonably likely to have made a difference in the jury's verdicts in each of the specific intent crimes, except burglary.

The Supreme Court in *Strickland* emphasized the importance of pretrial investigation as a prerequisite to any claim of tactical rejection of a potential defense. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (*Strickland*, *supra*, 466 U.S. at p. 691; accord, *Richter*, *supra*, 562 U.S. at p. 106.) "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland*, at pp. 690–691.)

"Criminal trial counsel have no blanket obligation to investigate possible 'mental' defenses, even in a capital case." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1244.) But if an attorney knows or has reason to know of the defendant's mental problems, the rule is otherwise. (*Ibid.*) Where evidence exists tending to show a mental state defense, and counsel fails to follow up on it, a finding of ineffective assistance of counsel has often resulted.[22] The question becomes whether there were enough red flags to impose upon

---

[22] An attorney's failure to investigate potentially helpful leads has frequently been deemed deficient performance, especially failure to investigate defenses based on mental illness, ingestion of drugs, or other factors going to state of mind. (See *Liao v. Junious* (9th Cir. 2016) 817 F.3d 678, 682–683 [failure to secure evidence supporting sleep-walking defense]; *In re Cordero* (1988) 46 Cal.3d 161, 181-182 [failure to investigate PCP-laced cigarette found at crime scene]; *In re Scott* (2003) 29 Cal.4th 783, 825–826

trial counsel an obligation to investigate further. In this case, we think there were. (See *Wiggins v. Smith* (2003) 539 U.S. 510, 527–528; *Rompilla v. Beard* (2005) 545 U.S. 374, 391, fn. 8 [counsel must not ignore " 'red flags' " relating to mitigation]; *Tharpe v. Warden* (11th Cir. 2016) 834 F.3d 1323, 1335 [citing cases where habeas petition had been successful because counsel ignored "red flags" relating to the petitioner's "upbringing or mental-health status"]; *Pruitt v. Neal* (7th Cir. 2015) 788 F.3d 248, 271–274 [failure to investigate and present evidence of mental illness].)

### b.      Factual Background

Kirkpatrick reviewed Cervantes's medical records and IEPs, but considered them "very harmful" to Cervantes's defense. The records showed Cervantes had consistent, "horrible behavioral problems" even before the age of 12. Kirkpatrick elected to forgo a mental state defense in part so she would not be required to turn over the IEP and mental health records to the prosecution. Pendergast, too, acknowledged the IEP reports were "obviously harmful," as were "a lot of things in this case," and that was one thing he would have to "balance" in deciding how to defend Cervantes.

Kirkpatrick also consulted with three experts about a possible mental state defense: Drs. Pettis and Podboy and Dr. Dale Watson. The defense use of mental health experts developed as follows: Pendergast did not hire a mental health expert in the three or four months he represented Cervantes. In approximately July 2011, Barton retained Dr. Pettis to evaluate the case. In seeking authorization for funds to retain Dr. Pettis, Barton described Cervantes as having "issues of substance abuse, organic brain damage

---

[whether defense counsel's " 'minimal' " investigation of a mental defense was professionally deficient was a "close question," but alleged error was non-prejudicial]; *In re Sixto* (1989) 48 Cal.3d 1247, 1258-1262 [failure to obtain blood alcohol test and to investigate possible PCP ingestion]; *People v. Ledesma* (1987) 43 Cal.3d 171, 222–224 [failure to adequately investigate and research diminished capacity defense]; *People v. Frierson* (1979) 25 Cal.3d 142, 162-164 [same]; *cf. Wade v. Calderon* (9th Cir.1994) 29 F.3d 1312, 1318–1319 [defense counsel not ineffective for declining to use PCP defense where "there was no evidence that [the defendant] ingested PCP on the day of the offense"), *cert. denied,* 513 U.S. 1120 (1995).)

& budding schizophrenia" and described Dr. Pettis as being "phenomenal on the witness stand." Kirkpatrick got in touch with Dr. Pettis early on in her representation of Cervantes, but Coffer reported that she never contacted Pettis again after March 15, 2012.

Dr. Pettis recommended that she retain a neuropsychologist to assist in the case. She did so by consulting Dr. Watson. Dr. Watson performed an IQ test on Cervantes, who scored 80. Kirkpatrick was surprised by this result, which ruled out any claim of mental retardation. According to Kirkpatrick's account, both Dr. Pettis and Dr. Watson were discouraging about the prospects of presenting a defense based on Cervantes's mental condition.

By August 2012, Kirkpatrick believed she had narrowed down the available defenses to "alcohol induced blackout" but was concerned that she would need her "client to testify that [h]e [d]idn't [r]emember anything." A few days later she contacted two different experts who could possibly support an alcohol intoxication defense and selected Dr. Podboy, a clinical and forensic psychologist, as the preferable expert. She was specifically interested in learning from Dr. Podboy whether Cervantes had experienced alcohol-induced blackouts. By mid-August 2012, she was also in touch with Zehnder, the forensic toxicologist who testified at trial, to estimate Cervantes's blood alcohol level at the time of the crimes.

Kirkpatrick had originally planned to use Dr. Podboy to testify about the effects of alcohol on Cervantes's mental state but decided against it for reasons we shall discuss below. Even on the first day of trial, Kirkpatrick represented to the court that she would call Dr. Podboy as an expert witness. Instead Kirkpatrick decided to use Zehnder to opine about Cervantes's likely blood alcohol level at the time of the crimes, and to explain to the jury the likely effects on people at various and increasing blood alcohol levels.

           c.      Weaknesses in the Voluntary Alcohol Intoxication Defense Actually Presented Could Have Been Resolved by Calling a Neuroscience Expert

36

Cervantes claims the defense pursued by Kirkpatrick was not a viable one. He points out especially that defense counsel did not call an expert witness to testify about the effects of alcohol intoxication at Cervantes's blood alcohol level. She did call Zehnder, but Cervantes now claims that a different expert witness, one capable of expressing an opinion on the effect of alcohol on a brain impaired as Cervantes's is allegedly impaired, and armed with more evidence of Cervantes's history of cognitive deficits, could have provided more helpful testimony.

Cervantes suggests that, had Kirkpatrick used a neuroscience expert instead of a toxicologist, the alcohol intoxication defense would have been much more likely to succeed. A neuroscience expert could have testified that Cervantes's alcohol consumption, coupled with Dr. Amen's SPECT scan results and Cervantes's mental health history, caused him to lapse into a "dissociative state" or "organic psychosis" in which he attacked the children. Indeed, Dr. Stalcup was evidently prepared to testify to that effect. He opined at the new trial hearing that even without psilocybin mushrooms, the alcohol and marijuana consumed by Cervantes alone, combined with the deficits revealed in the SPECT scan, would have led to organic psychosis. Such testimony would have been extremely helpful to the defense at trial.

Zehnder's testimony focused mostly on physical effects of alcohol intoxication, such as slurred speech, delayed reaction times, and loss of balance. Dr. Stalcup's testimony at the new trial motion, on the other hand, dealt specifically with what it means to be in a dissociative state, how one's brain functions in a dissociative state, and how one perceives reality in such a state. Such information would have been more useful to the jury in deciding a specific intent issue than Zehnder's testimony about impaired motor skills.

We are fully aware that testimony such as that offered by Drs. Shore and Stalcup at the new trial motion might be somewhat more constrained in a jury trial.[23] But we feel

_____

[23] Due to the elimination of the diminished capacity defense in California (§ 25) (see fn. 11, *ante*), experts may not testify about a defendant's "capacity" to form specific

37

certain that a similar expert would have been allowed to testify to his opinion that Cervantes was in a dissociative state when he committed the crimes and to give a general description of a dissociative state or organic psychosis in a manner that would have aided the jury and could have been persuasive. (See *People v. Herrera* (2016) 247 Cal.App.4th 467, 474–480.) We are also aware Kirkpatrick was up against a trial date when Dr. Podboy gave her the information about Cervantes possibly being in a "dissociative state" at the time of the crimes, but with the extreme penal consequences Cervantes was facing and the turnover in attorneys at the Conflict Defender's Office, a request for a continuance might well have been favorably received. Kirkpatrick did not ask for a continuance and went forward with the trial using Zehnder as her only expert witness. We agree with Cervantes that Kirkpatrick's selection of experts was not optimal and we find her reasons for deciding not to present a mental health expert, in light of the whole record, do not reflect the level of representation reasonably expected of a competent defense attorney in like circumstances.

---

mental states. (§ 28; *People v. Elmore*, *supra*, 59 Cal.4th at p. 139.) A mental health expert, or an expert on intoxication or addiction, also may not give testimony that the defendant did or did not, in fact, form the mental state required for conviction, for making that determination is the jury's role. (§ 29; see *People v. DeHoyos* (2013) 57 Cal.4th 79, 121 [assuming without deciding that section 29 would preclude an expert's testimony "tantamount to stating an opinion that defendant did or did not have the mental state required for the crime charged"]; *People v. Coddington* (2000) 23 Cal.4th 529, 582–583; *People v. Larsen* (2012) 205 Cal.App.4th 810, 826; *People v. Cortes* (2011) 192 Cal.App.4th 873, 908; *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364–1365.) What is left as a legitimate subject of expert testimony is somewhat uncertain; applying the evidentiary rules established by sections 25, 28 and 29 has been compared to venturing into a "legal 'bog.' " (*Nunn*, at p. 1364; see also, *Larsen*, at p. 828 [testimony about hypothetical situations similar to the actual case would "come dangerously close to the territory *precluded* by sections 28 and 29"].) But regardless of the uncertain contours of allowable expert testimony on a defense of diminished actuality in a given case, this much *is* certain: assuming the strategic calculus of advantages versus disadvantages favors pursuit of a defense of diminished actuality, there is unquestionably a range of allowable expert testimony that competent counsel would seek to present in support of such a defense, if the evidence supports it, and an expert is available to present it.

        d.        Kirkpatrick's Reasons for Not Using a Neuroscience Expert or Further Investigating a Dissociation/Brain Damage Defense Were Insufficient in Light of the Information Provided to Her by Drs. Pettis and Podboy.

Kirkpatrick testified she dropped Dr. Pettis as a potential expert witness because he told her Cervantes had antisocial personality disorder and was "basically bad." She recounted Dr. Pettis's opinion that Cervantes had consistent "behavioral problems" as a child and "always chose the wrong path." Pettis observed that Cervantes "respects no one" and frequently "loses his temper." Kirkpatrick thought Dr. Pettis would be a "horrible" witness.

Dr. Pettis denied making these statements and testified he told Kirkpatrick only that Cervantes's answers to questions might be taken as antisocial by a listener without some further explanation. In fact, he testified it was not possible to diagnose antisocial personality disorder in a person so young. He also told Kirkpatrick he did not think a functional mental illness defense was likely, but frontal cortex problems could account for Cervantes's behavior. Dr. Pettis testified he told Kirkpatrick he suspected brain impairment in Cervantes's case and insinuated he had told her to get Cervantes "brain-tested." He had not diagnosed Cervantes while retained by Kirkpatrick because he was awaiting the results of the neuropsychological testing. Dr. Pettis was surprised that Kirkpatrick cut off communication with him.

Kirkpatrick decided against using Dr. Watson as an expert because he "did not see any mental defenses." Dr. Watson found no "obvious mental health problems or anything that [Kirkpatrick] could use as a defense." His "final evaluation" was that he "did not have anything to help [her] further" on the case, and he told her "all [she] had was alcohol." Kirkpatrick evidently discounted him as a witness and decided not to use a mental health defense on the basis of his opinion, together with Dr. Pettis's.

Dr. Watson did not testify at the new trial hearing. Dr. Shore was asked about his conversations with Dr. Watson by the district attorney on cross-examination, and he suggested Dr. Watson had been investigating and was open to a "temporary insanity" (or diminished actuality) defense.

Kirkpatrick rejected Dr. Podboy as an expert because she felt she could not pin him down on exactly what his testimony would be. Besides, the doctor also told her Cervantes was an "alcoholic," which she did not consider helpful, though Coffer points out it could have been turned to his advantage in a diminished actuality defense. And, according to Kirkpatrick, Podboy performed a Minnesota Multiphasic Personality Inventory (MMPI) test on Cervantes without Kirkpatrick's request or permission, which Kirkpatrick considered inappropriate and potentially harmful to the defense because she would have to turn those documents over to opposing counsel if she used Podboy as an expert witness.[24]

Dr. Podboy's testimony at the hearing on the new trial motion was quite different from Kirkpatrick's. He was engaged to evaluate a defense based on alcohol intoxication, and specifically alcohol-induced blackouts, but he testified Kirkpatrick "cut [him] off pretty quickly." He claimed she stopped responding to his phone calls and her communication with him was so problematic that he reported the issue to her supervisor. This apparently occurred after the trial.

Dr. Podboy testified he had reached the preliminary conclusion that Cervantes was "in a dissociative state at the time of the incident" and included that finding in his notes, which he faxed to Kirkpatrick shortly before the trial started. The court refused to admit the notes into evidence based on a hearsay objection. This was evidentiary error, as Podboy's notes were relevant for the non-hearsay purpose of showing what information Kirkpatrick possessed in making her decisions. The issue is whether there were red flags in the documents such as to require further investigation, not whether the information in the red flags was true. Due to the erroneous ruling, we do not have Dr. Podboy's notes

---

[24] Dr. Podboy testified he did not administer the complete MMPI test to Cervantes. He used some of the questions from the MMPI as a "springboard" to understanding him. He acknowledged, however, that the questions he posed to Cervantes could have possibly been used to detect personality disorders.

before us, but we credit his testimony that he alerted Kirkpatrick to the possibility that Cervantes was in a "dissociative state" when he committed the crimes.

Dr. Podboy was not finished with his investigation when he stopped working for Kirkpatrick. In the course of the investigation he had learned Cervantes had chronic alcohol and substance abuse problems, and he may have been under the influence of psilocybin mushrooms at the time of the crimes. But, he testified, Kirkpatrick "blew [him] off" and told him, "We've already looked into that" whenever he tried to talk to her about issues other than alcohol-induced blackouts.

After considering Kirkpatrick's explanation for not using a mental health defense, we cannot help but conclude she rejected it primarily because of the negative comments found in the IEP and medical histories. Though that may have been a legitimate tactical decision if she had first investigated to find out what expert testimony might be available, we find her investigation was inadequate. Kirkpatrick rejected using a mental health expert before making a reasonable investigation that would have allowed a competent weighing of the pros and cons. (Cf. *Pruitt v. Neal*, *supra*, 788 F.3d at pp. 271–274 [mitigating evidence].)

Finally, Cervantes criticizes Kirkpatrick for not ordering a brain scan performed. She discussed that possibility with her supervisor, who suggested she ask Dr. Watson's opinion. Dr. Watson did not give her a clear answer. Kirkpatrick was not asked about any advice by Dr. Pettis on this point, and in his testimony Dr. Pettis implied he told her Cervantes needed to be "brain-tested." Combined with Dr. Podboy's advice that Cervantes was in a "dissociative state" when he committed the crimes, we conclude counsel should have followed up with further investigation. Further consultation, with Podboy, Watson or some other expert, was necessary before rejecting a diminished actuality defense based on organic brain damage as a synergistic cause of Cervantes's behavior, together with alcohol intoxication. A SPECT scan was one option in investigating further.

41

We realize the SPECT brain scan has been subject to criticism by some experts, who reject its use for diagnostic and forensic purposes.[25] We certainly do not suggest that a SPECT scan is required to comply with an attorney's objective standard of reasonable competence whenever mental problems are suspected in a client. But here, there were clear red flags that there might be organic brain issues. Counsel's failure to secure a SPECT scan, coupled with her failure to consult further with experts about next steps, contributes to our concern about the reliability of the verdicts. Regardless whether SPECT scans are universally accepted as a forensic tool, whether to accept or reject SPECT results would best be left to a jury.

> e.   Kirkpatrick's Faulty Investigation Requires Reversal of the Specific Intent Convictions, Except Burglary.

Wherever the truth lay in the communications between Kirkpatrick and her experts, the trial court found Kirkpatrick's testimony to be credible, and we normally defer to trial court findings on credibility. (See *People v. Jones* (2013) 57 Cal.4th 899, 917; *People v. Carasi* (2008) 44 Cal.4th 1263, 1290–1291; *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.) We do not doubt she truthfully reported her conversations with her experts as she recalled them. Nevertheless, we cannot ignore the disturbingly different testimony of Drs. Pettis and Podboy.

Judge Kinnicutt did find that Kirkpatrick's decisions were "competently made based upon the information she had at the time." The judge ultimately rejected the ineffective assistance of counsel claim on the basis that the jury would not have reached a different conclusion even if the mushroom and dissociation evidence had been admitted.

---

[25] See *People v. Banks* (2014) 59 Cal.4th 1113, 1143 [expert testified "SPECT imaging . . . shows whether all areas of the brain are getting proper blood perfusion, but cannot be used to make a diagnosis or predict behavior" and could not be used to prove defendant had "brain damage"]; *Yum v. Carey* (C.D. Cal. 2009) 2009 U.S. Dist. LEXIS 120284, at pp. *65–*71 [denying federal habeas relief where California trial court excluded defendant's SPECT evidence].

42

That is a conclusion about prejudice, which we review de novo.[26] (*People v. Ault* (2004) 33 Cal.4th 1250, 1264, fn. 8, citing *Strickland*, *supra*, 466 U.S. at p. 698.)

We have serious doubts about the quality of the defense Kirkpatrick provided in the realm of mental state evidence due to her insufficient investigation and resulting incompetent selection of an expert on the alcohol intoxication defense. (Cf. *People v. Frierson*, *supra*, 25 Cal.3d at p. 159 [presentation of an "undeveloped theory" of diminished capacity].) Four specific failings trouble us: (1) her failure to secure a copy of Dr. Pettis's notes; (2) her failure to conduct further investigation of the psilocybin mushroom defense; (3) her failure to follow up when Dr. Podboy told her Cervantes was probably in a "dissociative state" when he committed the crimes; and (4) her selection of Zehnder as the sole expert to testify in support of the alcohol intoxication defense.

We shall reverse all the convictions involving specific intent, except the burglary conviction and burglary special findings, as to which, for reasons already discussed, we do not feel the same concerns. Because the trial court had the discretion to grant the motion for a new trial as to some counts but not others (*People v. Drake* (1992) 6 Cal.App.4th 92, 99), we find it erred in denying the motion in its entirety. We reverse, however, only eight of the convictions that required specific intent, as specified in the disposition.[27]

---

[26] Since we reverse the convictions involving specific intent, we do not address Cervantes's argument that he was prejudiced in plea bargaining to a determinate term. The parties were far apart, and it is utterly speculative to suggest the prosecutor would have agreed to a term of years that Cervantes would have found acceptable, even if defense counsel had prepared more thoroughly for trial.

[27] Cervantes also claims Kirkpatrick violated her duty of loyalty by refusing to turn over her files to Obstler's firm after trial or otherwise cooperate in preparing the motion for a new trial. We agree she was under an ethical duty to turn over her files (State Bar of California, Standing Committee On Professional Responsibility And Conduct, *Issue: To What Extent Must a Criminal Defense Attorney, Having Been Relieved by Successor Counsel, Cooperate with New Counsel?*, State Bar Formal Opn. No. 1992-127, 1992 WL 166235), but we question Obstler's conclusion that she violated that duty. It appears she turned over her files, then stopped cooperating at the direction of

### B.  Proposition 57

#### 1.  *Overview of this Section*

Having concluded in the unpublished portion of our opinion that we must reverse eight counts of conviction that required specific intent and will affirm seven counts, including the burglary conviction, we now turn to the impact on our disposition of Prop 57, which was passed by the voters on November 8, 2016.[28] Six weeks later, Cervantes sought and was granted permission to file a supplemental brief arguing that Prop 57 should be applied retroactively to all non-final cases under the rationale of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), where the Supreme Court held that a legislative reduction in the statutory penalty for a crime must be applied to all non-final cases.  He contends Prop 57 requires us to vacate the judgment entered below and remand the case for a "fitness" or "transfer" hearing[29] in juvenile court, after which Cervantes would either be dealt with through the juvenile justice system, or else would be transferred by

---

her supervisor, and eventually cooperated fully after her supervisor changed his directive. Even if she was temporarily out of compliance with the ethical duty, such a failure does not give rise to a claim of ineffective assistance of counsel.  (See *Nix v. Whiteside* (1986) 475 U.S. 157, 165; *Roe v. Flores-Ortega* (2000) 528 U.S. 470, 479; *People v. Williams*, *supra*, 56 Cal.4th at p. 692.)

[28] Prop 57 also included provisions relating to prison inmates, prison credits, and eased access to parole consideration.  We deal in this opinion solely with the changes implemented with respect to juveniles.

[29] Under Welfare and Institutions Code former section 707, subdivision (a)(1) and (c), the determination to be made was whether the minor was a "fit and proper subject to be dealt with under the juvenile court law."  (See Stats. 2015, ch. 234, § 2, p. 2138.)  The current section, as amended by Prop 57, eliminates the phrase beginning "fit and proper subject"; instead, the juvenile court is simply empowered to "decide whether the minor should be transferred to a court of criminal jurisdiction."  (Welf. & Inst. Code, § 707, subd. (a)(2).)  Given this change, it is perhaps more correct to refer to the hearing as a "transfer" hearing.  The criteria to be used, however, correspond closely to the criteria used to determine fitness.  (Compare Welf. & Inst. Code, § 707, subd. (a)(2)(A)–(E) with Welf. & Inst. Code, former § 707, subds. (a)(1)(A)–(E), (a)(2)(B)(i)–(v), (c)(1)–(5) (Stats. 2015, ch. 234, § 2, pp. 2138–2139).)  We use the terms "fitness hearing" and "transfer hearing" interchangeably.

44

the juvenile court[30] to adult court under Welfare and Institutions Code, section 707[31] for a new trial. In fact, he contends this procedure is mandated for any counts reversed on appeal and remanded for a new trial, even if Prop 57 is *not* given retroactive effect. He then suggests that such a disposition would result in "split" jurisdiction between two courts, with reversed counts going to juvenile court and affirmed counts remaining in criminal court, which would violate the rule of *In re Dennis J.* (1977) 72 Cal.App.3d 755, 760–762 (*Dennis J.*) that the same juvenile cannot have charges pending in both criminal court and juvenile court that might lead to conflicting orders from the two divisions. (But see Welf. & Inst. Code, § 707.01, subd. (a)(1) [allowing simultaneous jurisdiction].) Hence, he reasons, we may not reverse some counts and affirm others. A new trial of all counts is required.

We reject the argument that Prop 57 gives Cervantes, in effect, a full "do over" on all counts despite the fact he has already been tried, convicted and sentenced, but we conclude that Prop 57, even if not given retroactive effect—which we conclude is not mandated—nonetheless requires a fitness hearing. That hearing will, in effect, determine which department of the superior court, the juvenile court or the adult criminal court, will try any remaining counts on remand (should the People elect retrial) and will decide the *consequences* Cervantes faces for the offenses of which he stands convicted or that are found to be true following remand.

In arriving at this conclusion, we specifically reject Cervantes's argument that he is entitled to a fitness hearing on retroactivity or equal protection grounds because (1) the

---

[30] We refer to "juvenile courts" and "criminal courts" throughout this section of the opinion, rather than the more unwieldy "court of criminal jurisdiction" (Welf. & Inst. Code, § 707, subd. (a)) or "superior court sitting as a juvenile court" (see Welf. & Inst. Code, § 245.) We use "adult court" and "criminal court" (or a combination of the two) interchangeably.

[31] In this section of our opinion we shall refer to both former and current Welfare and Institutions Code section 707 as "Section 707" and to both former and current Welfare and Institutions Code section 602 as "Section 602." The former sections will be designated as such.

45

juvenile division and criminal division of superior court both have subject matter jurisdiction over statutorily specified crimes committed by minors; (2) the statutory amendments under Prop 57 do not amount to a reduction of a penalty and are not subject to retroactive application under *Estrada*; and (3) failing to extend the new hearing procedure to Cervantes does not deprive him of equal protection because a prospective procedural change in the law that treats offenders differently depending upon when their crimes were committed does not violate equal protection. We ultimately agree, however, based on both the text of Prop 57 and the ameliorative purpose behind it, that Cervantes is entitled to a fitness hearing before he may be retried or resentenced in adult court. The initiative measure fundamentally favors rehabilitation over punishment[32] for juveniles and requires procedural changes to ensure that juveniles facing trial in adult criminal court will receive a judicially conducted fitness hearing first. Because Cervantes once again faces a trial or resentencing on remand, he is entitled under Prop 57 to a transfer to juvenile court for a fitness hearing, as described in Section 707, before retrial or resentencing.

2.       *Procedure for Transferring a Minor to Adult Court under Prop 57*

Historically, California required a judicial determination of unfitness for juvenile court before a minor could be prosecuted in adult court. (See Stats. 1961, ch. 1616, § 2, p. 3485; Stats. 1975, ch. 1266, § 4, p. 3325; *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1489, & fn. 4 (*Juan G.*).) Beginning in March 2000 and continuing until the adoption of Prop 57, however, the district attorney was authorized, as a matter of executive discretion, to file a criminal action against a juvenile in certain defined

---

[32] This change of focus corresponds to a legislative change in section 1170, subdivision (a)(1), which recently adopted the language "the purpose of sentencing is public safety achieved through punishment, rehabilitation, and restorative justice." (§ 1170, subd. (a)(1), as amended by Stats. 2016, ch. 696, § 1, effective January 1, 2017.) Beginning in 1977 and for nearly 40 years thereafter, the same statute reflected a pure punishment model: "The Legislature finds and declares that the purpose of imprisonment for crime is punishment." (Former §1170, subd. (a)(1), added by Stats. 1976, ch. 1139, § 273, operative July 1, 1977.)

46

circumstances, rather than filing the case in juvenile court, a practice known as "direct filing" or "discretionary direct filing." (Former § 707, subd. (d); see Voter Information Guide, Primary Elec. (Mar. 7, 2000) Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, § 26, pp. 126–127 (Prop 21); see generally, *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548–550 (*Manduley*); *Juan G.*, at p. 1489 & fn. 4.) Some crimes, like Cervantes's, were considered so serious by the voters that, if committed by a minor age 14 or older, juvenile court was not an option; filing in adult criminal court was mandated by statute ("mandatory direct filing").[33] (Former § 602, subd. (b); see Prop 21, § 18, p. 125; *Juan G.*, at pp. 1488–1489.) Mandatory direct filing had first been instituted by the Legislature for juveniles age 16 or older effective January 1, 2000 (Stats. 1999, ch. 996, § 12.2, p. 7560), but Prop 21 reduced the age to 14.

Prop 57 was designed to undo Prop 21. After the passage of Prop 57, the charging instrument for all juvenile crimes must be filed in juvenile court. (See § 602.) While prosecuting attorneys may move to transfer certain categories of cases to criminal court (§ 707, subd. (a)(1)), they have no authority to directly and independently file a criminal complaint against someone who broke the law as a juvenile, even by committing the crimes that previously qualified for mandatory direct filing. In cases where transfer to adult court is authorized (§ 707, subd. (b)) (and not all cases qualify),[34] the juvenile court

---

[33] Mandatory direct filing existed before Prop 21 was passed, but it was authorized only for youths age 16 or older. (Stats. 1999, ch. 996, § 12.2, p. 7560; *Manduley*, *supra*, 27 Cal.4th at pp. 549–550; *Juan G.*, *supra*, 209 Cal.App.4th at pp. 1488–1490.)

[34] Under former Section 707, for minors age 16 and over, transfer was authorized for any felony listed in former Section 707, subdivision (b) (former § 707, subd. (d)(1)), or any other felony if committed in the circumstances described in former section 707, subdivision (d)(3). (Former § 707, subd. (a)(1).) Fourteen and 15-year-old minors could be transferred to adult court only if they were charged with one of 30 crimes listed in former section 707, subdivision (b), which, as relevant to this case, included attempted murder, forcible rape, sodomy, oral copulation, forcible lewd act with a child under age 14, torture and aggravated mayhem. (Former § 707, subd. (b)(4)–(7), (12), (23) & (24).) Cervantes would continue to be eligible for transfer to adult court under the new law, but he would be entitled to a fitness hearing before transfer. (§ 707, subds. (a)(2), (b)(4)–(7),

47

now has sole authority to determine whether the minor should be transferred. (§ 707, subd. (a)(2); see *Brown v. Superior Court* (2016) 63 Cal.4th 335, 340–341 [describing history and general provisions of the initiative measure].) Thus, Prop 57 effectively guarantees a juvenile accused felon a right to a fitness hearing before he or she may be sent to the criminal division for prosecution as an adult.

### 3. *Prop 57 Is Not Retroactive.*

Cervantes relies on two provisions of Prop 57 in advancing his claim of retroactivity: (1) Section 602 was amended to provide that jurisdiction in the juvenile court is what Cervantes calls "exclusive"; and (2) Section 707 was amended to require a fitness hearing in juvenile court as a prerequisite for transfer of a juvenile to adult criminal court. (§ 707, subd. (a).) He relies on voter intent to invest greater efforts in rehabilitation—"especially for juveniles"—in order to stop the "revolving door" of crime. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141, (2016 Voter Guide).) Because a juvenile court has a time limit on jurisdiction over its wards (e.g., Welf. & Inst. Code, §§ 607, 607.1, 1769), and because its focus is on rehabilitation,[35] Cervantes argues the new transfer provisions effectively mandate more lenient treatment—or a reduction in punishment—such that Prop 57 must be applied retroactively under *Estrada*.

We reject Cervantes's position on retroactivity because (1) jurisdiction is concurrent in crimes that subject the juvenile offender to adult prosecution; (2) *Estrada*'s reasoning does not support a retroactive application; and (3) subsequent Supreme Court cases interpreting *Estrada* have limited it to situations in which there is, strictly speaking,

---

(12), (23) & (24).) Under prior law he was not entitled to adjudication in juvenile court under any circumstances and was not entitled to a fitness hearing because at age 14 he was alleged to have committed the above-specified sex crimes in circumstances warranting one-strike treatment. (Former § 602, subd. (b)(2)(A), (D) & (F).)

[35] E.g., Welf. & Inst. Code, §§ 202, 1700; *Manduley*, *supra*, 27 Cal.4th at p. 593; *In re Greg F.* (2012) 55 Cal.4th 393, 416–417; *In re Kasaundra D.* (2004) 121 Cal.App.4th 533, 539.

a " ' "legislative mitigation of the penalty *for a particular crime*." ' " (*People v. Brown* (2012) 54 Cal.4th 314, 325 (*Brown*).)

          a.        Section 602 Does Not Deprive the Criminal Division of Concurrent Subject Matter Jurisdiction Over Statutorily Specified Crimes Committed by Juveniles.

With the passage of Prop 57, Section 602 now reads: "Except as provided in Section 707, any person who is under 18 years of age when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." Cervantes contends this gives the juvenile court "exclusive jurisdiction" over his case and the cases of all juvenile offenders[36] whose cases are not yet final on appeal—at least until a fitness hearing is conducted.

Yet, the statute does not use the term "exclusive," and it assigns jurisdiction over all juvenile criminal matters to the juvenile court explicitly subject to the exceptions in Section 707. Section 707 applies to "a minor . . . alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute, or of an offense listed in subdivision (b) when he or she was 14 or 15 years of age." Section 707, subdivision (b) lists 30 serious crimes that subject even the youngest juveniles eligible for criminal prosecution under section 707, ages 14 and 15, to adult prosecution.

We conclude, for crimes that qualify the juvenile offender for transfer to adult court, subject matter jurisdiction is concurrent between the criminal division and the juvenile division. "The juvenile court and the criminal court are divisions of the superior court, which has subject matter jurisdiction over criminal matters and civil matters,

---

[36] We use the term "juvenile offender" to refer to "any person who is under 18 years of age when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age." (§ 602.)

including juvenile proceedings. (See Cal. Const., art. VI, § 10.) When exercising the jurisdiction conferred by the juvenile court law, the superior court is designated as the juvenile court. (Welf. & Inst. Code, § 245.) Accordingly, when we refer herein to the jurisdiction of the juvenile court or the jurisdiction of the criminal court, we do not refer to subject matter jurisdiction, but rather to the statutory authority of the particular division of the superior court, in a given case, to proceed under the juvenile court law or the law generally applicable in criminal actions. (See *In re Harris* (1993) 5 Cal.4th 813, 837.)" (*Manduley*, *supra*, 27 Cal.4th at p. 548, fn. 3.) To the extent Cervantes suggests Prop 57 deprives the criminal court of fundamental subject matter jurisdiction over a juvenile felon[37] upon remand after appeal, we disagree.[38]

---

[37] We use the term "juvenile felon" to denote "a minor . . . alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute, or of an offense listed in subdivision (b) [of Section 707] when he or she was 14 or 15 years of age." (§ 707, subd. (a)(1).)

[38] *Manduley* decided implementation of the direct file system under Prop 21 did not violate the Equal Protection Clause. (*Manduley, supra,* 27 Cal.4th at pp. 567–573.) Cervantes, too, contends denial of a fitness hearing in his case would deprive him of equal protection. But Cervantes is not similarly situated with a juvenile felon who committed his crimes after Prop 57 was enacted. (See *Brown*, *supra*, 54 Cal.4th at pp. 328–330 [rejecting equal protection argument based on legislative changes in the rates at which defendants earn presentence conduct credits].)

Moreover, we conclude if there was no equal protection problem in adopting the direct file procedure, there can be no equal protection problem in abandoning it. Both systems are merely different approaches or experiments in how best to deal with juvenile delinquents, and a state may change course without creating equal protection problems. (*People v. Spears* (1995) 40 Cal.App.4th 1683, 1688 [" 'It is perfectly proper for the Legislature to create a new sentencing procedure which operates prospectively only. Despite the disparity created by rendering different sentences after an admittedly arbitrarily chosen date, prospective application of such a statute does not violate equal protection principles, because of the legitimate public purpose' " motivating the change of law.].) " '[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.' " (*People v. Floyd* (2003) 31 Cal.4th 179, 191, quoting *Sperry & Hutchinson Co. v. Rhodes* (1911) 220 U.S. 502, 505 [*Floyd* refused to apply drug treatment alternative sentencing retroactively].)

Prop 57's amendment to Section 602 does not govern where jurisdiction must be sited permanently, nor does it either prescribe or prohibit revisiting the jurisdictional issue when a case is remanded for a new trial. Being subject to Section 707, subdivision (b), which lists the crimes that may qualify a 14-year-old for transfer to criminal court, Cervantes is subject to concurrent jurisdiction in both criminal and juvenile divisions of superior court. Here, the criminal division lawfully assumed jurisdiction under pre-Prop 57 law and retained jurisdiction throughout the trial; Section 602 does not oust the criminal division of jurisdiction upon remand after an appeal.

b. *Estrada*'s Reasoning Does Not Support Retroactive Application of Prop 57.

New statutes or changes in statutes ordinarily are applied prospectively only, "absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 (*Tapia*); see also § 3; *Brown*, *supra*, 54 Cal.4th at pp. 319–323.) Nevertheless, a well-recognized exception prevails when a criminal statute reduces the penalty for a given crime; in that circumstance, the new, less punitive statute applies to all defendants whose convictions are not yet final on appeal. (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

*Estrada* involved an escape without force or violence from the California Rehabilitation Center at a time when that offense required a minimum one-year additional sentence and a two-year minimum after being returned to custody before parole consideration. (*Estrada*, *supra*, 63 Cal.2d at p. 743.) Between the time of the escape and the time Estrada was convicted, however, the governing statutes were amended to reduce the minimum term to six months for nonviolent escape and to require no minimum period before parole consideration. (*Id*. at pp. 743–744.) Estrada was being held in custody solely because of the minimum terms required by the former version of the statute and would have been entitled to release under the new version. (*Id.* at p. 744.) Finding the reduction in penalty amounted to a legislative decision that the prior law had been too harsh, the Court held the amended statutes applied to the petitioner. "[L]egislative mitigation of the penalty for a particular crime" called for the retroactive

application of the reduced penalty, effectively establishing a rule that any law reducing the penalty for a crime was intended to apply to all non-final judgments. (*Id*. at p. 745; see also, *People v. Conley* (2016) 63 Cal.4th 646, 656 [*Estrada*'s holding "reflects a presumption about legislative intent, rather than a constitutional command"].)

                    c.       The Supreme Court Has Limited *Estrada* to Statutory Changes That Mitigate the Penalty for a Particular Offense.

Cervantes argues that Prop 57 amounts to a reduction in punishment, requiring us to find it retroactive under *Estrada*. But later Supreme Court cases have limited *Estrada's* retroactivity exception to statutory changes that mitigate the penalty for a particular crime, which is not true of Prop 57.

In 1991, in response to Proposition 115 (Prop 115), which, among other things, gave judges in criminal trials the power to conduct voir dire instead of attorneys (see Code Civ. Proc., § 223), *Tapia*, *supra*, 53 Cal.3d 282 held most of the new procedures, including that relating to voir dire, were not retroactive under *Estrada*. (*Id*. at pp. 287.) *Tapia* emphasized that the retroactivity exception turns on the type of legal change effectuated by the new or amended statute: changes in direct penal consequences like the one under consideration in *Estrada*, would call for retroactive application, while those like the one involved in *Tapia* that "address the conduct of trials which have yet to take place, rather than criminal behavior which has already taken place" are to be applied prospectively.[39] (*Id.* at pp. 288–289.) Under that rubric, the transfer procedure dictated

---

[39] In applying these rules, *Tapia* identified four categories of legal changes introduced by Prop 115, including those that "change the legal consequences of criminal behavior to the detriment of defendants" and others described as "provisions which clearly benefit defendants" or "benefit only defendants." (*Tapia*, *supra*, 53 Cal.3d at pp. 297, 300.) The first category of changes could not be applied retroactively, but *Tapia* saw no impediment to applying the latter category of rules in trials involving crimes that had occurred before the effective date of Prop 115. (*Id*. at pp. 300–301.) *Tapia* suggests such laws "may be applied to pending cases" if they " 'lessen the punishment' " for crime. (*Id*. at p. 301.) We believe *Brown* has narrowed *Estrada* further, requiring that a statute " 'mitigat[e] . . . the penalty for a particular crime' " before it is accorded retroactive effect. (*Brown, supra,* 54 Cal.4th at p. 326.)

by Prop 57 is not one that addressed "criminal behavior which has already taken place," but is more correctly identified as one "address[ing] the conduct of trials which have yet to take place." (*Ibid.*)  This suggests its application should be prospective only.

*Brown*, *supra*, 54 Cal.4th 314 even more strongly supports a prospective application.  *Brown* dealt with a situation more closely linked to the length of punishment for an offense than Prop 57 is.  Specifically, *Brown* addressed the legislative changes in presentence conduct credits in 2010–2011, which first gave pretrial detainees more generous conduct credits, then reverted to less generous credits, and finally switched back again to more generous credits.  (*Brown*, at pp. 317–318, 320.)  The Supreme Court unanimously decided that a jail inmate awaiting trial and sentencing should earn credits at the rate in effect at the time he served the days in jail, not at the more generous rate available when he was sentenced.  (*Id.* at pp. 319–330; see also, *In re Strick* (1983) 148 Cal.App.3d 906, 909–914 [legislation to allow greater worktime credits in prison held not to apply retroactively and not to violate equal protection].)

*Brown* recognized that a change in credits-earning eligibility would affect the length of a prisoner's time in custody, and in that sense would have a direct effect on punishment (*Brown*, *supra*, 54 Cal.4th at p. 325), but nevertheless held *Estrada* did not apply.  The *Brown* court called the *Estrada* rule a "contextually specific qualification to the ordinary presumption that statutes operate prospectively."  (*Id.* at p. 323.)  It reasoned, "the rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*" ' (*Estrada*, at p. 745, italics added) because such a law supports the inference that the Legislature would prefer to impose the new, shorter penalty rather than to ' "satisfy a desire for vengeance" ' (*ibid*.).  The same logic does not inform our understanding of a law that rewards good behavior in prison." (*Brown*, at p. 325.)

We find the rationale underlying *Estrada* equally inapplicable to the procedural changes implemented by Prop 57.  While Prop 57 will have a substantive impact on time in custody in some cases—sometimes a big impact—the transfer procedure required under Section 707 does not resemble the clear-cut reduction in penalty involved in

*Estrada*. Although it is now the juvenile court, rather than the district attorney, that makes the decision whether a juvenile felon will be tried as an adult, we may presume that many cases filed in juvenile court will still end up in adult court (with adult penalties) under Prop 57, after the fitness hearing is held. Prop 57 mitigates the penalty for a particular crime even less directly than the jail credits at issue in *Brown*. More like the voir dire procedure in *Tapia,* which affected who performed a particular function in the judicial process, Prop 57 may or may not in some attenuated way affect punishment, but it is not a direct reduction in penalty as required for retroactivity under *Estrada*. (*Brown*, *supra*, 54 Cal.4th at p. 325.)

4.   *Applied Prospectively, Prop 57 Requires A Fitness Hearing Before a Juvenile Felon Is "Tried in Adult Court" Initially or on Remand.*

a.   Textual Provisions of Prop 57 and Principles of Statutory Construction Bearing on this Issue

Section 2 of Prop 57, titled "Purpose and Intent," "[r]equire[s] a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (2016 Voter Guide, *supra,* text of Prop. 57, § 2, p. 141.) The Legislative Analyst spoke even more strongly: "the only way a youth could be tried in adult court is if the juvenile court judge in the hearing [under Section 707, subdivision (a)(2)]] decides to transfer the youth to adult court." (2016 Voter Guide, *supra,* analysis of Prop. 57 by Legis. Analyst, p. 56.) Thus, the phrase, "tried in adult court"—or the prospect of being tried in adult court— appears to be the trigger for a juvenile's right to a fitness hearing. This case requires us to confront whether prospective application of Prop 57 requires a fitness hearing if a juvenile felon has had one trial in adult court but is about to be tried again because his case is being remanded for partial retrial or resentencing.

The key statutes amended to effectuate the juvenile provisions of Prop 57 were Section 602 and Section 707, the latter of which provides for the mechanics of the fitness hearing. (2016 Voter Guide, *supra*, text of Prop 57, §§ 4.1 & 4.2, pp. 141–142.) Section 707 describes the ordinary chronology of a fitness hearing when charges are filed after Prop 57's effective date. (See section II.B.2, *ante*, and section II.B.4.c., *post*.) It does not

purport to explore the conduct of or entitlement to such a proceeding on remand. Section 707 describes its reach broadly, indicating it applies "[i]n *any case* in which a minor is alleged to be a person described in Section 602." (§ 707, subd. (a)(1), italics added.) We see nothing in Section 707 that requires the allegation to be pending in juvenile court at the time of the fitness hearing. One of the allegations included in each of the counts in the amended information in criminal court was that Cervantes was "14 years of age" at the time of his crimes, citing former Section 602, subdivision (b). Thus, in facing retrial on remand, Cervantes facially qualifies for a fitness hearing. Nothing in Prop 57 indicates the offense had to occur on or after the effective date of Prop 57 in order for the new procedures to apply. (Cf. *John L. v. Superior Court* (2004) 33 Cal.4th 158, 169; *In re Chong K.* (2006) 145 Cal.App.4th 13, 18–19.) The amendment to section 602 is also critically important to understanding the availability of a fitness hearing because it strikes out entirely former subdivision (b) and its reference to mandatory direct filing, thus raising the question whether a criminal prosecution may be reinitiated on retrial where the original filing was by authority of former subdivision (b). Together, these two sections provide a general framework for a transfer hearing in all post-Prop 57 initiated juvenile cases, but neither sheds much light on how Section 707 should be applied, if at all, in the case of a remand.

"In interpreting a voter initiative . . . , we apply the same principles that govern the construction of a statute." (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 (*Canty*).) Of course, when the intent of a statute is clear from the plain meaning of its text, we follow its mandates without looking elsewhere. (*Greb v. Diamond Internat. Corp.* (2013) 56 Cal.4th 243, 256; *People v. Leal* (2004) 33 Cal. 4th 999, 1008.) Clear intent, clearly expressed, is decisive. But Section 707, to the extent it provides clues to the availability of a fitness hearing on remand, does not explicitly or by clear implication either authorize or preclude such a procedure. It does anticipate the fitness hearing will be conducted "prior to the attachment of jeopardy." (§ 707, subd. (a)(1).) As we shall discuss, that language naturally raises a question as to whether, on a retrial after remand, jeopardy attaches anew with the swearing of a new jury, or whether the reference to "attachment of

jeopardy" should be construed as a reference to the attachment of jeopardy at the first trial. We find the language of Section 707 to be ambiguous on the issue before us, which requires that we consult additional interpretive aids in understanding its meaning.

" '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a measure comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.' " (*Canty*, *supra*, 32 Cal.4th at p. 1276; accord, *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "When construing a statute or an initiative measure, we are obliged to give effect to every phrase and paragraph of the law, leaving no part useless or deprived of meaning." (*People v. Nava* (1996) 47 Cal.App.4th 1732, 1737.) "Because the most reasonable interpretation of a [statutory] provision [enacted as a voter initiative] may be reflected, in part, by evidence of the enacting body's intent beyond the statutory language itself, in its history and background [citation], [a court] also consider[s] the measure as presented to the voters with any uncodified findings and statements of intent. In considering the purpose of legislation, statements of the intent of the enacting body contained in a preamble, while not conclusive, are entitled to consideration. [Citations.] Although such statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute." (*Canty*, *supra*, at p. 1280.) In determining voter intent, we may also look to the ballot arguments favoring the measure, the Legislative Analyst's interpretation, and the history of the initiative measure. (*Amwest Sur. Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1256.)

Applying those guidelines, additional uncodified provisions of Prop 57 inform our interpretation of its scope. Uncodified section 5 mandates that Prop 57 be "broadly construed to accomplish its purposes," and that section actually prohibits the Legislature from amending Section 602 and Section 707 unless "such amendments are consistent with and further the intent of this act." (2016 Voter Guide, *supra*, text of Prop. 57, § 5, p. 145.) Uncodified section 9 also advises us to "liberally construe[] [Prop 57] to effectuate its purposes." (2016 Voter Guide, text of Prop 57, § 9, p. 146.)

In reaching our conclusion about the availability of a fitness hearing on remand, we employ the usual rules of construction to ascertain the intent of the electorate, which of course is our ultimate objective in any endeavor to construe a voter initiative. (*Canty*, *supra*, 32 Cal.4th at p. 1276.) We find especially significant, indeed controlling, the tenet requiring us to read a statute in a manner to effectuate its underlying purpose. (*Id*. at pp. 1276–1277 ["The intent of the law prevails over the letter of the law, and ' "the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.]' "]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal. 3d 208, 245 ["The literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers."].) With these principles and provisions in mind, we turn to the task of determining Prop 57's impact on this case.

> b.      The Ameliorative Intent Underlying Prop 57 Is Implemented Largely Through the Requirement of an Impartial Judicial Fitness Hearing to Inquire into the Juvenile Felon's "Behavioral Patterns and Social History" and to Determine His or Her Amenability to Rehabilitation Through Juvenile Court.

Taking a broad view of the stated "Purpose and Intent" of Prop 57 in section 2 of the initiative measure, we must first acknowledge it as a dramatic change of course and a ringing endorsement of rehabilitation as opposed to pure punishment, especially for youthful offenders. Indeed, Prop 57 expressly aimed to "Stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles." (2016 Voter Guide, *supra,* text of Prop. 57, § 2, p. 141.) The ballot argument in favor of Prop 57 noted that the measure "[r]equires judges instead of prosecutors to decide whether minors should be prosecuted as adults, emphasizing rehabilitation for minors in the juvenile system. [¶] *We know what works*. Evidence shows that the more inmates are rehabilitated, the less likely they are to re-offend. Further evidence shows that minors who remain under juvenile court supervision are less likely to commit new crimes. Prop. 57 focuses on evidence-based rehabilitation and allows a juvenile court judge to decide whether or not a minor

should be prosecuted as an adult." (2016 Voter Guide*, supra*, Argument in Favor of Proposition 57, p. 58.)

Prop 57 resulted in several important changes in the juvenile court law that, considered in light of its increased emphasis on rehabilitation, convince us Cervantes should be given a fitness hearing on remand. We are struck first with Prop 57's insistence that "a judge, not a prosecutor, [must] decide whether juveniles should be tried in adult court." (2016 Voter Guide, *supra,* text of Prop. 57, §2, p. 141.) This suggests the electorate wanted an impartial decision-maker to weigh the juvenile felon's prospects for rehabilitation before allowing him or her to be "tried in adult court," with its attendant consequences. And judicial discretion was to be exercised in every individual case, regardless of the juvenile's crime.

Thus, Prop 57 eliminated the category of mandatory direct file crimes and offenders that under prior law had foreclosed any prospect of the rehabilitative juvenile model entirely to the most serious offenders, even as young as 14. (2016 Voter Guide, *supra,* text of Prop. 57, § 4.1, pp. 141–142.) This amendment represented a fundamental policy shift and a rejection of the concept of mandatory direct filing.

By excising subdivision (b) of Section 602, the voters determined that every juvenile facing trial in criminal court should first have his or her fitness for treatment under the juvenile court law. Under Prop 57, even those who have committed the most heinous crimes, and even if they are nearer to the age of majority, are entitled to a fitness hearing and the exercise of judicial discretion before transfer to adult court. This suggests an underlying popular conviction that no minor should be considered irredeemable or beyond rehabilitation without an individualized look at his or her background and characteristics.[40]

---

[40] We note that this expressed policy is broadly consistent with the rationale adopted by the United States Supreme Court in of *Graham, supra*, 560 U.S. 48, and *Miller v. Alabama* (2012) 567 U.S. __, 132 S.Ct. 2455 (*Miller*), discussed below in connection with Cervantes's Eighth Amendment contentions (see *post*, section II.C), that

Turning to the nature of the hearing provided, the probation department must first prepare and provide to the court a report on the juvenile's "behavioral patterns and social history" (§ 707, subd. (a)(1); 2016 Voter Guide, *supra,* text of Prop. 57, § 4.2, p. 142.) The report forms a partial basis for the court's ultimate decision, when considered in combination with any evidence the juvenile or the district attorney might present. (§ 707, subd. (a)(2).) In deciding whether to retain jurisdiction or transfer the minor to adult court, the court must consider specific statutorily defined factors, namely, the degree of criminal sophistication exhibited by the minor; whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction; the minor's previous delinquent history; the success of previous attempts by the juvenile court to rehabilitate the minor; and the circumstances and gravity of the offense alleged to have been committed by him or her. (§ 707, subd. (a)(2)(A)–(E).)

Though Cervantes claimed at the new trial motion that he had certain cognitive impairments and was drug-addled and in a dissociative mental state at the time of the crimes, he has never had such evidence presented on his behalf in a forum where his amenability to rehabilitation was an issue to be decided. Because he was subject to mandatory direct filing, no one ever exercised discretion to determine whether he was suitable for treatment in juvenile court. Yet, being 14 at the time of his crimes, Cervantes was in the youngest category of offenders subject to criminal prosecution under Section 707.

Thus, if we remand Cervantes for retrial without ordering a fitness hearing, he will fall into the subset of juveniles in which no discretion has ever been exercised, either by the district attorney or by the juvenile court, to determine whether the juvenile court law might have something to offer for his rehabilitation. This new opportunity, while not a "mitigation of penalty" in the *Estrada* sense, must be recognized as ameliorative in

a juvenile's immaturity and potential for rehabilitation must be taken into account before any sentence amounting to life imprisonment is imposed.

59

intent, and sometimes in substance, and not just a difference in identity of the person performing identical procedural tasks, such as that involved in *Tapia*.

          c.       The Requirement That the District Attorney Make the Transfer Motion "Prior to the Attachment of Jeopardy" Does Not Negate the Possibility That the Voters Intended Prop 57 to Apply on Remand.

We must next determine whether the electorate intended to provide the same procedural protections to a juvenile felon returning to superior court for retrial after an appeal. Complicating the question is the fact that Prop 57 requires the district attorney's transfer motion to be brought "prior to the attachment of jeopardy." (§ 707, subd. (a)(1).) There was no occasion here for a transfer motion—which normally triggers a fitness hearing—because this case was prosecuted under the old "direct file" regime. The "prior to the attachment of jeopardy" language tends to suggest the electorate intended a Prop 57 fitness hearing to occur near the beginning of the case against a juvenile felon, before the jurisdictional hearing in juvenile court. (See fn. 41, *post*.) Literally and narrowly read, that language could be taken to mean that, if a case were transferred from criminal court to juvenile court for a fitness hearing after jeopardy had attached in criminal court, the case would be stuck in juvenile court, with no means for the district attorney to move it back to criminal court. We have no trouble concluding the voters would not have wanted a construction of Prop 57 that would leave the district attorney hamstrung by a claim the motion was untimely. Deciding the applicability of Prop 57 to Cervantes on remand forces us to grapple with the question of when jeopardy attaches in this context.

Ordinarily, in criminal cases, jeopardy attaches when the jury, including alternates, is sworn.[41] (*People v. Hernandez* (2003) 30 Cal.4th 1, 5.) Our task is to determine

---

[41] "In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn. [Citations.] In a nonjury trial, jeopardy attaches when the court begins to hear evidence." (*Serfass v. United States* (1975) 420 U.S. 377, 388.) In juvenile proceedings, jeopardy attaches when the court " ' "enters upon" ' " jurisdictional proceedings, or when the first witness is sworn. (*People v. Malveaux* (1996) 50 Cal.App.4th 1425, 1439.)

whether Cervantes may be tried on remand without a fitness hearing four years after his first jury was sworn, but before the trial court will embark on empaneling a new jury and conducting a new trial or resentencing on remand.

Of course, the question of the attachment of jeopardy usually arises in the context of the double jeopardy prohibition of the Fifth Amendment.  (U.S. Const., 5th Amend.)  "The double jeopardy rules are well known. The protection against double jeopardy generally precludes retrial for the same offense after a conviction or an acquittal.  [Citation.]  An exception to this rule applies if the judgment of conviction is reversed as a result of a defendant's appeal, motion for new trial, or other challenge by a defendant to his or her conviction.  [Citation.]  Like other constitutional guarantees, double jeopardy protections are not absolute, and may be waived by a defendant.  A defendant who files a motion for a new trial, like a defendant who moves for a mistrial, waives state and federal double jeopardy protections.  [Citations.]  By seeking reversal of a judgment of conviction on appeal, ' "[i]n effect [a defendant] assents to all the consequences legitimately following such reversal, and consents to be tried anew . . . ." ' (*People v. Sachau* (1926) 78 Cal.App. 702, 706.)" (*People v. Eroshevich* (2014) 60 Cal.4th 583, 590-591.)  Under a waiver theory, jeopardy apparently does reattach with the swearing of a second jury on remand, but because the defendant initiated the appeal, he is deemed to have waived any double jeopardy objection to a retrial.  Because *Eroshevich* appears to be the most recent statement on the subject from our state Supreme Court,[42] we follow the waiver theory adopted in that case.

Under that theory, we gather, Cervantes was no longer in jeopardy after he was convicted and sentenced in the trial below.  Nevertheless, when his jury is sworn to retry the reversed counts in any upcoming trial upon remand, he will once again be "put in

---

[42] We recognize there is some older authority to the contrary.  (See *Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 606 ["jeopardy as to an offense of which a defendant has been convicted continues during appellate proceedings and retrial following reversal of the judgment"].)

jeopardy of life or limb." (U.S. Const., 5th Amend.) His retrial is constitutionally permissible only because he implicitly waived his right to challenge it on double jeopardy grounds.

But does the waiver of a double jeopardy challenge by appeal necessarily encompass a waiver of new and more protective pretrial procedures enacted since Cervantes's last trial? We think not. If Prop 57 was intended to give every juvenile felon a right to a fitness hearing before being "tried in adult court," as we have held, then we think that right pertains to a second trial upon remand, as well. In context, the "prior to attachment of jeopardy" provision governs only *timing* of the prosecutor's transfer motion, not the more fundamental question of the defendant's *entitlement* to such a hearing. In the absence of express guidance in the text of Prop 57 on this particular point, we decline to adopt a reading of the "attachment of jeopardy" language that treats those two questions as one and the same. We find it unlikely the voters read the jeopardy phrase as disentitling a defendant to a fitness hearing on remand. (See also, 2016 Voter Guide, *supra,* text of Prop. 57, § 9, p. 146.) By our understanding of jeopardy principles, if we instruct the trial court to transfer the case to juvenile court for a fitness hearing before commencing any retrial, the district attorney will have an opportunity to request a transfer to adult court "prior to the attachment of jeopardy" within the meaning of Section 707, subdivision (a)(1), since by obtaining the benefit of section 707 in that circumstance, the defendant implicitly waives any right to object to a transfer motion. At oral argument, Cervantes' counsel explicitly waived any such objection, but we make clear that, having requested a fitness hearing at a point following the initial attachment of jeopardy, the waiver is deemed made by his acceptance of the benefit of section 707.

5. *Cervantes Is Eligible for A Fitness Hearing on Remand, Even If the Reversed Counts Are Dismissed and He Is Only Resentenced on the Affirmed Counts.*

Because we realize the district attorney may opt not to retry Cervantes, we must also decide whether Cervantes will be entitled to a fitness hearing on remand if the district attorney decides not to retry him and the trial court then proceeds straight to

62

resentencing. In other words, when Prop 57 mandates a fitness hearing before a juvenile felon is "tried in adult court" does it also mandate such a hearing before a defendant remanded after appeal is simply resentenced, rather than being retried?

We have already discussed the voters' strong support for providing a fitness hearing for every juvenile facing the prospect of being "tried in adult court." We now explain our conclusion that the voters were equally committed to providing such a hearing before a juvenile convicted of a felony could be *sentenced* in adult court.

The Supreme Court has found the word "trial" to be "ambiguous" in terms of whether a "trial" encompasses the sentencing. "[W]hile the word 'trial' has long been interpreted to refer to the process culminating in the determination of guilt, particularly in bail cases [citations], the word has also been interpreted to include the sentence or judgment in other cases [citations]. Accordingly, we recognize that the word is ambiguous as to whether it includes proceedings following the determination of guilt . . . ." (*People v. Overstreet* (1986) 42 Cal.3d 891, 896 [plur. opn.]; accord, *In re Martin* (1987) 44 Cal.3d 1, 49–50 [opn. of Mosk, J., for a unanimous court].) For some purposes, the word "trial" does not encompass the sentencing. (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1253 [remand for retrial treated differently from remand for resentencing for motion under Code Civ. Proc., § 170.6]; *People v. Stuckey* (2009) 175 Cal.App.4th 898, 910–913 (*Stuckey*) ["trial" does not include sentencing for purposes of Evid. Code, § 730, but acknowledging the word is "ambiguous"]; *People v. Domenzain* (1984) 161 Cal.App.3d 619, 621–623, & fn. 4 [for purposes of time limits under section 1382, "brought to trial" on remand does not include delay in resentencing].)

That it is "ambiguous" means the word "tried" or "trial" may have different meanings in different contexts and different statutes. For instance, it has been recognized that the right to a speedy trial, guaranteed by the Sixth Amendment as well as by the state constitution (Cal. Const., art. I, § 15) and state statute (§§1191, 1202, 1381.5, 1382), includes the right to a speedy sentencing. (See *Pollard v. United States* (1957) 352 U.S. 354, 361 [assuming arguendo the "sentence is part of the [criminal] trial for purposes of the Sixth Amendment"]; *People v. Mahan* (1980) 111 Cal.App.3d 28, 32 [state and

63

federal constitutional rights to "speedy trial" include prompt sentencing]; *People v. Brown* (1968) 260 Cal.App.2d 745, 750–751 ["Although in certain contexts the expression 'brought to trial' might possibly encompass only that portion of the criminal proceeding which results in a determination of the accused's guilt or innocence, it is clear that as used in section 1381.5 it includes the entry of a judgment or other final, appealable order. The imposition of sentence is an essential part of the speedy trial guaranteed to all accused."]; see also, *People v. Hsu* (2008) 168 Cal.App.4th 397, 404 [declining to decide whether defendant had a right to speedy sentencing, but citing authorities acknowledging such a right]; cf. *People ex rel. Dorris v. McKamy* (1914) 168 Cal. 531, 535–536 ["the word 'trial,' as commonly understood in our practice, includes nothing beyond proceedings in the court in which the case originated"; appeal was not part of trial].) Similarly, a penalty trial in a capital case is regarded as part of a "single, unitary criminal proceeding" that includes a "retrial, be it of the entire proceedings or the penalty phase only." (*People v. Superior Court* (*Mitchell*) (1993) 5 Cal.4th 1229, 1233–1234 [discovery allowed "at trial" under § 1054.3, subd. (a)(1) encompassed the penalty phase of a capital trial].) Sentencing is also recognized as a "critical stage" in the "criminal prosecution[]" for purposes of the Sixth Amendment right to counsel. (U.S. Const., 6th Amend.; *Mempa v. Rhay* (1967) 389 U.S. 128, 133 [" 'the right to counsel is not a right confined to representation during the trial on the merits' "]; cf. *People v. Arbee* (1983) 143 Cal.App.3d 351, 356 [right to "fair trial" entitles defendant to be present at sentencing because it "constitutes an essential and material phase of the criminal proceeding"].)

Our task is to determine the meaning of "tried in adult court" in section 2 of Prop 57. Considering the material in the ballot pamphlet, we believe when the voters approved Prop 57, they most likely understood being "tried in adult court" to encompass all the proceedings in a criminal trial court, including sentencing. As demonstrated above, this is not an unheard of construction.

In reaching this conclusion we are cognizant that, although juvenile court jurisdiction would normally require Cervantes's release from custody at age 23[43] (Welf. & Inst. Code, § 1769, subd. (c)), there are provisions allowing appropriate authorities to petition to keep a youthful inmate committed under Section 602 in custody longer—up to "the maximum term prescribed by law for the offense of which he or she was convicted"—based on concerns about public safety and dangerousness. (Welf. & Inst. Code, §§ 1780, 1782.) Upon petition by the Department of Youth Authority (now called the Division of Juvenile Facilities (DJF)), a minor committed under Section 602, who is about to reach the maximum age he can be held at DJF and who has not yet been confined for the maximum term attributable to his offenses, may be held for the remainder of the term applicable to the crimes of which he or she was convicted if the petitioner can show "that unrestrained freedom for that person would be dangerous to the public." (Welf. & Inst. Code, § 1780; see generally, *Chaparro v. Superior Court* (1990) 218 Cal.App.3d 560, 562–568 (*Chaparro*).) In that situation, the inmate is entitled to a judicial hearing in which he or she has rights to presence, appointed counsel, compulsory process, and the right to produce evidence. (Welf. & Inst. Code, § 1781.)

Similarly, the prosecuting attorney may petition for extended detention if the inmate "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior . . . ." (Welf. & Inst. Code, § 1800; see *Chaparro*, *supra,* 218 Cal.App.3d at pp. 565, 568.) The inmate is entitled to a jury trial on whether he or she represents a physical danger to the public. (Welf. & Inst. Code, § 1801.5.) In such circumstances, a juvenile offender over age 21 may be transferred to the Department of Corrections and Rehabilitation for appropriate placement in order to

---

[43] The juvenile court maintains jurisdiction over minors committed to the Division of Juvenile Facilities until age 25 at the oldest, or age 23 for more recent commitments. If the minor had not yet served a period of two years in custody, the commitment may be extended until he or she has completed a "two-year period of control." (Welf. & Inst. Code, §§ 1769, subds. (b) & (c), 1771, subd. (b).)

protect other wards in the DJF.  (Welf. & Inst. Code, § 1802.)  Renewed petitions may be filed every two years to keep the inmate in custody for two-year intervals.  (*Ibid*.)

Thus, if the juvenile court were to retain jurisdiction after the fitness hearing, it would not necessarily result in an early release from custody for Cervantes, but it would give him a far greater opportunity for periodic inquiries into the necessity of his continued incarceration.  Thus, a juvenile disposition must realistically be considered a more advantageous disposition than a criminal sentence for the same offense.  And giving Cervantes a fitness hearing upon remand, while not required under *Estrada*, removes one obstacle to his obtaining an earlier discharge from custody.

We conclude the voters who approved Prop 57 intended a juvenile felon to have a fitness hearing before being sentenced in adult criminal court.  We arrive at that conclusion based on the purposes underlying Prop 57, discussed above, and on the fact that, for many juvenile felons, including many whose crimes were less serious than Cervantes's, the time in custody they face in criminal court is far longer than their likely term of confinement in juvenile court.  Indeed, it is the vastly more serious *consequences* of trial in criminal court that makes the choice of tribunal so important.

That choice remains equally significant in the case of a retrial or resentencing. Cervantes has already been tried in adult court under direct filing and has been sentenced to literally a lifetime in prison.  Though we shall reverse Cervantes's sentence on constitutional grounds, he faces almost equally severe consequences over again on remand, even without a retrial.  It is not primarily the prospect of enduring another guilt determination that adversely affects Cervantes, however.  Indeed, in some ways a trial in adult court offers the juvenile felon procedural advantages not available in juvenile court.[44]  Instead, it is the severe sentencing options available in adult court that stand to seriously limit Cervantes's access to freedom at some meaningful point in his lifetime.

---

[44] For instance, minors whose cases are adjudicated in juvenile court have no right to a jury trial.  (*People v. Superior Court of Santa Clara County* (1975) 15 Cal.3d 271, 274.)  As another example, the rule requiring corroboration of accomplice testimony does

Acknowledging the practical reality that adult criminal sentencing is the biggest disadvantage to being "tried in adult court," we find it hard to imagine the electorate wanted juveniles to receive a fitness hearing before being "tried" in adult court without also intending that juveniles receive such a hearing before being "sentenced" in adult court. We therefore hold that, beginning with the effective date of Prop 57, a juvenile felon may not be "sentenced in adult court" without a prior transfer hearing under Section 707, subdivision (a), if he or she so requests. We further hold that when a juvenile felon requests a fitness hearing after guilt determination but before sentencing, he waives any objection to the timeliness of the district attorney's motion to transfer the case back to adult court. For purposes of our case, that means, upon remand, even if the district attorney elects not to retry Cervantes on the reversed counts, Cervantes must nevertheless be granted a fitness hearing upon request before he may be resentenced on the affirmed counts. [45] We note that, even if Cervantes is ultimately transferred back to criminal court, the fitness hearing will also serve the purpose of making a record of any mitigating factors that may apply when he eventually comes up for parole. (See *People v. Franklin* (2016) 63 Cal.4th 261, 284–287 (*Franklin*).)

### 6. *Proceedings After Remand*

Upon remand, should Cervantes seek a fitness hearing, we shall order the trial court to suspend proceedings and transfer Cervantes to the juvenile court, where the court shall proceed as described in Section 707. If that occurs, the trial court shall hold the criminal proceedings in abeyance until completion of the fitness hearing. The juvenile court shall order the probation department to prepare a study of Cervantes's "behavioral

---

not apply in juvenile delinquency proceedings. (*In re Mitchell P.* (1978) 22 Cal.3d 946, 948–953.) And at disposition, *Cunningham v. California* (2007) 549 U.S. 270 does not apply in juvenile court. (*In re Christian G.* (2007) 153 Cal.App.4th 708, 712–715; *In re Alex U.* (2007) 158 Cal.App.4th 259, 265–266.)

[45] We emphasize, however, that this right to a fitness hearing on remand—whether for retrial on the merits, or just for sentencing—applies only to defendants who, like Cervantes, have not had a fitness hearing previously, and it is a right that may be exercised only once, even if a remand is granted more than once in subsequent appeals.

patterns and social history," and the juvenile court shall consider that report in making a determination of fitness. (§ 707, subd. (a)(1).) The district attorney may present additional evidence of unfitness, and Cervantes shall have an opportunity to present evidence on his own behalf. (§ 707, subd. (a)(2).)

After the transfer hearing, if the juvenile court were to decide to retransfer Cervantes to the criminal division, the criminal court would then order the case back on calendar and proceed with the new trial or resentencing, at the People's election. (See Welf. & Inst. Code, § 707.1, subd. (a).) If the juvenile division were to determine that jurisdiction should be retained for further adjudication and disposition, then the trial court would transfer the matter to juvenile court for all purposes.

There are at least two statutes already in place that provide a procedural framework for a transfer to juvenile court while proceedings remain suspended in criminal court, from which the trial court may take direction on remand. Either statute may serve as a model for the procedure to be employed. First, Welfare and Institutions Code section 604 provides for suspension of proceedings in criminal court and certification to juvenile court when it is discovered that the defendant was a minor when the crime was committed. Rule 4.116 of the California Rules of Court establishes the procedure for such a transfer and spells out the information that must be provided to the juvenile court. A second analogue is section 1170.17, which allows for transfer from criminal court to juvenile court before sentencing for the express purpose of a fitness hearing. Section 1170.17 provides for a judicial assessment of fitness before sentencing whenever a juvenile felon has been "prosecuted" under the criminal law "and the prosecution was lawfully initiated in a court of criminal jurisdiction without a prior finding that the person is not a fit and proper subject to be dealt with under the juvenile court law." (§ 1170.17, subd. (a).) In such a case, upon conviction, the defendant may bring a motion for a fitness hearing. (*Ibid.*; *id.* at subd. (b).) Under the Rules of Court, however, Cervantes himself and other juvenile felons tried in criminal court under the

68

direct filing procedure are not eligible to bring a motion under section 1170.17.[46] The procedure described in that section may nevertheless be used on remand for the fitness hearing we order under Prop 57.

### C. Eighth Amendment

#### 1. *Cervantes's Eighth Amendment Claims*

Cervantes also claims he must be granted relief from an unconstitutional sentence, which he alleges is unconstitutional because it was imposed for reasons of retribution (*Miller*, *supra*, 132 S.Ct. at p. 2469) and because it is a de facto sentence of life without possibility of parole (LWOP). (*Graham*, *supra*, 560 U.S. at p. 74; *Caballero*, *supra*, 55 Cal.4th at p. 268.) Given our remand for a fitness hearing in juvenile court, this case may not return to adult criminal court for resentencing. But in the event it does, and since, in any event, the maximum term of confinement that may be imposed on Cervantes in adult court or in juvenile court (see Welf. & Inst. Code, § 726, subd. (d)) is subject to the same constitutional limitation, we turn to Cervantes' Eighth Amendment claims so that any sentence imposed—wherever that may occur—may be selected with our view of the constitutional limits in mind. As we explain below, because we deal with nonhomicide offenses and find the sentence to be the functional equivalent of LWOP, we find *Graham* and *Caballero* controlling and do not reach the issue raised under *Miller*.

#### 2. *The Sentence Is the Functional Equivalent of LWOP and Therefore Violates the Eighth Amendment under* Graham *and* Caballero.

##### a. The Reasoning of *Graham* and *Caballero*

The Eighth Amendment of the United States Constitution forbids "cruel and unusual punishments." (U.S. Const., 8th Amend.; see also, Cal. Const., art. I, § 17

---

[46] "If the prosecuting attorney lawfully initiated the prosecution as a criminal case under Welfare and Institutions Code section 602(b) or 707(d), and the minor is convicted of a criminal offense listed in those sections, the minor must be sentenced as an adult." (Cal. Rules of Court, rule 4.510(a); see also § 1170.17, subds. (b) & (c) [juvenile felons are eligible for pre-sentence fitness hearing if they were transferred to criminal court under subdivisions and subject to presumptions not applicable to Cervantes].)

["cruel or unusual"].)  In *Graham*, *supra*, 560 U.S. 48 the Supreme Court held the states may not sentence a juvenile nonhomicide offender to LWOP.[47]  (*Id.* at p. 74.)  The court specifically noted that youth are different from adults, not just younger.  The Court cited research showing that a minor's brain is not fully developed.  (*Id.* at p. 68.)  "As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] . . .  Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.'  [Citation.]  A juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.' " (*Ibid.*, quoting *Roper v. Simmons* (2005) 543 U.S. 551, 561–570 [unconstitutional to execute someone for crimes committed under age 18].)

"[B]ecause juveniles have lessened culpability they are less deserving of the most severe punishments." (*Graham*, *supra*, 560 U.S. at p. 68.)  Finding young people to be qualitatively different from adults, *Graham* concluded the Eighth Amendment demands qualitatively different treatment at sentencing.  *Graham* explained that a sentence of life without parole for one so young "gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, [and] no [reason for] hope." (*Id.* at p. 79.)  The sentence " 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile convict], he will remain in prison for the rest of his days.' " (*Id.* at p. 70.)

But it was not ultimately the severity of the eventual punishment that inspired the Supreme Court to declare LWOP sentences unconstitutional for juvenile offenders; it was

---

[47] *Miller*, *supra*, 132 at page 2469 extended *Graham* by holding it is unconstitutional to sentence a juvenile *homicide* offender to a *mandatory* sentence of life without possibility of parole; rather, sentencing authorities must use their discretion in considering mitigating circumstances, especially factors relating to the youthfulness of the offender. (*Miller*, at pp. 2467–2469.)

the lack of opportunity for parole release.  (*Graham, supra,* 560 U.S. at p. 74.)  "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.  What the state must do, however, is give [juvenile offenders] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  (*Id.* at p. 75.)

In *Caballero*, the California Supreme Court held *Graham*'s reasoning also applies to a "term-of-years sentence that amounts to the functional equivalent of a life without parole sentence."  (*Caballero*, *supra*, 55 Cal.4th at p. 268.)  "[S]entencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future."  (*Ibid.*)  In *Caballero* the sentence was 110 years to life, which obviously exceeded the defendant's life expectancy.  (*Id.* at p. 265.)  *Caballero* defined the life expectancy of a juvenile sentenced to prison for life as "the normal life expectancy of a healthy person of defendant's age and gender living in the United States."  (*Id*. at p. 267, fn. 3.)  Its holding seems to require sentencing and reviewing courts to consult mortality tables to determine the constitutionality of a proposed or actual sentence.

In the years since *Caballero*, the published cases in California have defined a sentence of 43 years to life, with parole eligibility at age 55, as constitutional (*People v. Bell* (2016) 3 Cal.App.5th 865, 872–880; see also *People v. Perez* (2013) 214 Cal.App.4th 49, 51–52 [30-to-life sentence, with parole eligibility at age 47, not de facto LWOP]) and a sentence of 75-to-life, with parole eligibility at age 84, as unconstitutional (*People v. Lewis* (2013) 222 Cal.App.4th 108, 119 (*Lewis*).)  Between those poles, each court is on its own in determining where the constitutional boundaries lie.  Although no published California case has declared a sentence unconstitutional that did not exceed the

defendant's predicted life expectancy, there is out-of-state authority to suggest that a sentence allowing only "geriatric release" would be equally unconstitutional.[48]

The California Supreme Court currently has pending before it a case that is expected to address whether a "total sentence of 50 years to life or 58 years to life [is] the functional equivalent of life without the possibility of parole for juvenile offenders[.]" (*People v. Contreras* (Jan. 15, 2015, D063428) [nonpub. opn.] review granted Apr. 15, 2015, S224564.) In the meantime, we must decide this case, applying *Caballero*. Ours is an easy decision because it falls clearly within *Caballero*'s prohibition. The more difficult decisions occur when the minimum eligible parole date falls shortly before the expiration of the defendant's life expectancy.

b.       Section 3051 Does Not Apply to Cervantes.

In response to *Graham*, *Miller* and *Caballero*, in 2013 the California Legislature enacted section 3051 affording youthful offenders earlier parole hearings, making most eligible for parole after 15 or 25 years in prison. (§ 3051, added by Stats. 2013, ch. 312,

---

[48] In some states a sentence of 60 years to life, or even less, has been held to be the equivalent of life without parole, even though first parole eligibility may not technically extend beyond the youthful defendant's life expectancy. (*State v. Ragland* (Iowa 2013) 836 N.W.2d 107, 109–110, 120–122 [60 years unconstitutional]; *Peterson v. State* (Fla. App. 2016) 193 So.3d 1034, 1038–1039 & fn. 8 [56-year sentence with opportunity for release at age 74 was unconstitutional]; *Bear Cloud v. State* (Wyo. 2014) 334 P.3d 132, 142 [" '[t]he prospect of [only] geriatric release' " is the functional equivalent of life without parole]; *State v. Null* (Iowa 2013) 836 N.W.2d 41, 71 (*Null*) [52.5 years is de facto life sentence even though evidence "does not clearly establish that [the defendant's] prison term is beyond his life expectancy," but rather may "come within two years of his life expectancy"]; see also, *Casiano v. Comm'r of Corr.* (Conn. 2015) 115 A.3d 1031, 1035, 1044–1045 & fn. 15 [50 years without possibility of parole was a de facto LWOP for purposes of applying *Miller*'s sentencing requirements]; but see, *Williams v. State* (Fla. App. 2016) 197 So.3d 569, 572 [50-year sentence not de facto LWOP]; *State v. Zuber* (N.J. Super. 2015) 126 A.3d 335, 348–349 [110-to-life sentence with parole after 55 years was not de facto LWOP], revd. by *State v. Zuber* (N.J. 2017) ___ A.2d ___, 2017 N.J. LEXIS 5 [defendant entitled to resentencing applying *Miller* factors]; *State v. Cardeilhac* (Neb. 2016) 876 N.W.2d 876, 888–889 [60-to-life, with parole eligibility after 30 years,  is not de facto LWOP];  *Hayden v. Keller* (E.D.N.C. 2015) 134 F.Supp.3d 1000, 1008–1009 [collecting cases on both sides of issue].)

72

§§ 1, 4, pp. 2658–2662; *Franklin*, *supra*, 63 Cal.4th at pp. 276–278.)  Section 3051,

however, specifically carves out an exception for juveniles sentenced under the one-strike

law, as Cervantes was.  (§§ 667.61, subd. (a), 3051, subd. (h).)  In so doing, our

Legislature has decided that juveniles convicted of certain serious sex crimes under

aggravated circumstances may be kept in prison more than 25 years before being given a

chance for parole.  How much longer remains a matter for individual trial judges to

determine on a case-by-case basis.  *Franklin* and section 3051 have no application here.[49]

### c.    Cervantes Must Serve More Than 66 Years in Prison Before He Will Be Eligible for Parole.

*Caballero* mandates that we compare the date upon which Cervantes will first

become eligible for parole release and the date upon which he is expected to die, using

actuarial tables.  (*Caballero*, *supra*, 55 Cal.4th at pp. 267, fn. 3, 268.)  If his life

expectancy expires before he becomes eligible for a parole hearing, his sentence is

unconstitutional.  (*Id*. at p. 268.)  As we shall explain, the 66 years that Cervantes must

serve before becoming eligible for parole exceeds his life expectancy and the sentence is

unconstitutional.

At the outset, we are confronted with the question of when Cervantes will be

eligible for a parole hearing at which he would have an opportunity to "obtain release

based on demonstrated maturity and rehabilitation."  (*Graham*, *supra*, 560 U.S. at p. 75.)

Because the parties' briefs did not seem to agree on his parole eligibility date, we

requested supplemental briefing.  The parties have now informed us his minimum

eligible parole date is September 23, 2077, as calculated by the California Department of

---

[49] In *Franklin*, the state Supreme Court was nominally confronted with the question whether the 16-year-old defendant's life sentence with the possibility of parole after 50 years was unconstitutional.  Because under section 3051 Franklin would be eligible for a parole hearing in his 25th year of incarceration (*Franklin*, *supra*, 63 Cal.4th at p. 268), the Court held the issue had become moot and therefore declined to decide whether the sentence was the functional equivalent of LWOP.  (*Id*. at pp. 268, 276–280.) It remanded to allow Franklin to provide mitigating evidence relevant to his eventual youthful offender parole hearing.  (*Id.* at pp. 269, 284, 286–287.)

Corrections and Rehabilitation (CDCR).[50]  This means he will be 80 years old when he first becomes eligible for parole.[51]

Calculating his first parole eligibility date requires us to resolve a potential ambiguity between the one-strike law (§ 667.61) and worktime credits under section 2933 et seq.  As enacted in 1994, section 667.61, subdivision (j) provided limited conduct credits of 15 percent to one-strike offenders (Stats. 1994, 1st Ex. Sess. 1993–1994, ch. 14, § 1, pp. 8570, 8572),[52] but even those credits were eliminated in 2006.  The Sex Offender Punishment, Control, and Containment Act of 2006 (SOPCC) (Sen. Bill 1128 (2005–2006 Reg. Sess.)), amended section 667.61 to eliminate subdivision (j) and any reference to presentence conduct credits for one-strike offenders.  (Stats. 2006, ch. 337, § 33, pp. 2639–2641.)  Proposition 83, passed by the voters in November 2006, made similar changes.  (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, pp. 127–131.)  The legislative history of the SOPCC, as well as the ballot pamphlet, reveal that the removal of former subdivision (j) was intended to eliminate conduct credits for defendants sentenced under section 667.61.  As the Legislative Counsel's Digest of Senate Bill 1128 explains:  "Existing law requires the person to receive credits for time served or for work, to reduce his or her sentence. [¶] This bill . . . would

_____

[50] We hereby deny Cervantes's amended request for judicial notice filed November 30, 2016.

[51] The parties have also informed us that Cervantes will first be eligible for a parole hearing in 2051, but the Attorney General calls it a "consultation hearing."  Cervantes will not be eligible for release until 2077.

[52] Section 667.61, former subdivision (j), provided: "Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 [credit on term of imprisonment] shall apply to reduce the minimum term of 25 years in the state prison imposed pursuant to subdivision (a) or 15 years in the state prison imposed pursuant to subdivision (b).  However, in no case shall the minimum term of 25 or 15 years be reduced by more than 15 percent for credits granted pursuant to Section 2933 [prison conduct credit], 4019 [presentence conduct credit], or any other law providing for conduct credit reduction.  In no case shall any person who is punished under this section be released on parole prior to serving at least 85 percent of the minimum term of 25 or 15 years in the state prison."

eliminate the possibility of the person receiving credit to reduce his or her sentence."
(See also, Sen. Com. on Public Safety, analysis of Sen. Bill No. 1128 (2005–2006); Voter
Information Guide, Gen. Elec. (Nov. 7, 2006), analysis by Legis. Analyst and text of
Prop. 83, pp. 42, 131 at <http://vig.cdn.sos.ca.gov/2006/general/pdf/english.pdf> [as of
March 9, 2017].)

The trial judge apparently was aware of the 2006 amendments because he awarded
Cervantes no conduct credits for presentence custody and told Cervantes he also would
receive no conduct credits in prison. The legislative history leaves no doubt the judge
was correct.

Thus, under our reading of the statutes, which is consistent with CDCR's
calculation, Cervantes is not entitled to worktime credits in prison, except on his 11-year
determinate sentence. Ordinarily, a defendant sentenced to a life term is eligible for
parole after serving seven years or other minimum term established by law, whichever is
greater. (§ 3046, subd. (a).) In this case, a 50-year minimum term was imposed under
section 667.61 (two consecutive 25-to-life terms on counts 11 and 13). Thus, Cervantes
will be required to serve at least 50 years with no worktime or conduct credits before
reaching his minimum eligible parole date. (§§ 2933.1, subd. (a), 3046, subd. (a)(2).)
Although CDCR is awarding him 15 percent worktime credit on his determinate term for
attempted murder of I.A., he must still serve more than nine years of his 11-year sentence
before becoming eligible for parole.[53] Cervantes's additional consecutive life term for
the attempted murder of A.P. adds seven more years in computing Cervantes's minimum
eligible parole date (§ 3046, subds. (a)(1) & (b)), making him ineligible for parole release
until he serves more than 66 years of his sentence.

---

[53] Attempted murder is a violent felony (§ 667.5, subd. (c)(12)) and thus subject to
limited credits under section 2933.1. CDCR appears to have calculated Cervantes's
minimum eligible parole date based on the assumption that Cervantes is entitled to 15
percent credit on his 11-year determinate sentence for attempted murder of I.A. We have
no occasion to agree or disagree with that statutory interpretation.

75

      d.      Cervantes's Sentence Is Unconstitutional under *Graham* and *Caballero.*

The aggregate sentence imposed on Cervantes is unconstitutional under *Caballero* because it exceeds his life expectancy. The California Center for Health Statistics records the life expectancy for a Hispanic male born in California between 1995 and 1997 as 79 years (Cal. Center for Health Statistics, California Life Expectancy: Abridged Life Tables by Race/Ethnicity for California 1995-97, p. 2 at <http://www.cdph.ca.gov/pubsforms/Pubs/OHIRLifetables1995-1997.pdf> [as of March 9, 2017]), whereas he will not be eligible for parole until age 80. Although the impact of growing up, and growing old, in prison may well reduce Cervantes's actual life expectancy significantly, we need not attempt to quantify that impact in this case.[54] Even assuming the life expectancy for Hispanic men outside of prison would apply equally to Cervantes, his minimum eligible parole date is still beyond the likely end of his life.[55] The sentence therefore constitutes the functional equivalent of LWOP.

---

[54] Poor prison conditions in California and the lack of adequate medical care have been well-documented. (*See Brown v. Plata* (2011) 563 U.S. 493,507–509 [noting poor health care and overcrowding in California's prisons results in a rise of prison violence and spread of infectious diseases].) A study drawing on data from New York prisons found that for each additional year spent in prison, an inmate's life expectancy declines by two years. (Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003* (March 2013) Am. J. of Pub. Health, Vol. 103, No. 3.) Another study used data from Michigan to estimate that the average life expectancy for Michigan inmates incarcerated for natural life sentences from the time they were juveniles is 50.6 years, whereas the life expectancy for adults subject to the same sentence is 58.1 years. (*Michigan Life Expectancy Data for Youth Serving Natural Life Sentences*, Campaign for the Fair Sentencing of Youth, ACLU of Mich. (April 2013) p. 2, at <http://fairsentencingofyouth.org/wp-content/uploads/ 2010/02/Michigan-Life-Expectancy-Data-Youth-Serving-Life.pdf> [as of March 9, 2017].)

[55] The use of life expectancy tables has been criticized in the context of determining cruel and unusual punishment under *Graham*. (*Zuber*, *supra*, 126 A.3d at pp. 347–348 [discussing problems with use of life expectancy tables]; *Null*, *supra*, 836 N.W.2d at p. 71 ["we do not believe the determination of whether the principles of *Miller* or *Graham* apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates"]; Cummings &

Granted, with our reversal of the attempted murder convictions, the remaining sentence would be 50 years to life. Even that long a minimum term before parole eligibility is now under scrutiny by our Supreme Court. Assuming a 50-year to life sentence ultimately passes constitutional muster, and although the parole authorities or the juvenile court may decide to keep Cervantes in prison for the remainder of his life without offending the Constitution, would be error of constitutional dimension under *Graham* and *Caballero* for a sentencing judge to write him off as irredeemable at the time of initial sentencing. (*Graham*, *supra*, 560 U.S. at pp. 68, 75; *People v. Caballero*, *supra*, 55 Cal.4th at pp. 268–269.) Giving Cervantes a fitness hearing will give him the same opportunity to present a case for his rehabilitative potential, in much same way that Section 3051 does, where it applies.

## III. DISPOSITION

The judgment is affirmed as to counts 3, 8, 9, 11, 12, 13 and 14 and their accompanying enhancements and findings. The judgment is reversed as to counts 1, 2, 4 through 7, 10 and 15, together with accompanying enhancements and findings, as is the sentence on all counts. The true findings on section 667.61, subdivision (d)(4) are stricken and shall not be considered for any purpose. The cause is remanded for further proceedings in accordance with this opinion.

Before any further proceedings are conducted in criminal court, Cervantes may avail himself of a fitness hearing, and if he does so, the matter shall be transferred to the juvenile court for a transfer hearing under Section 707. The trial court shall suspend criminal proceedings pending the outcome of that hearing. The transfer hearing shall be conducted substantially in compliance with the views expressed in this opinion. Copies

---

Colling, *There is No Meaningful Opportunity in Meaningless Data: Why it is Unconstitutional to Use Life Expectancy Tables in Post-Graham Sentences* (2014) 18 UC Davis J. Juv. L. Policy 267, 288–294 [suggesting that any sentence that withholds a juvenile offender's first parole hearing for more than 35 years should be deemed unconstitutional].)

of the transfer order, the amended information, and this opinion must be transmitted by the trial court to the clerk of the juvenile court.  (Cf. Cal. Rules of Court, rule 4.116(c).)

After the transfer hearing, if the case is transferred to the criminal court, the district attorney may elect to retry the reversed counts within the time allowed by statute. The time limit shall run from the date of the juvenile division's order on the fitness hearing.  If the district attorney elects not to retry those counts, the charges shall be dismissed. After retrial, or after dismissal of the reversed counts, Cervantes shall be resentenced in accordance with the views expressed in section II.C. of this opinion, allowing him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," as required by *Graham*, *supra*, 560 U.S. at pages 74–75, and *Caballero*, *supra*, 55 Cal.4th at page 268.

Due to our resolution of the ineffective assistance of counsel claim, a copy of this opinion shall be sent to the State Bar of California and trial counsel shall be notified of the referral.  (Bus. & Prof. Code, § 6086.7.)


_____

Streeter, J.


We concur:


_____

Ruvolo, P.J.


_____

Rivera, J.

Trial Court:   Solano County Superior Court

Trial Judge:   Hon. Harry S. Kinnicutt

Counsel:

Arnold & Porter, Peter Obstler, Ginamarie Caya for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Joan Killeen, Deputy Attorney General for Plaintiff and Respondent.